**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1955

_____

GUNAWAN LIEM,

Petitioner

**v.**

ATTORNEY GENERAL UNITED STATES OF AMERICA,

Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA: A079-709-771)
Immigration Judge:  Honorable Alberto J. Riefkohl

_____

Argued on February 6, 2019

(Opinion filed April 19, 2019)

Before:  HARDIMAN, SCIRICA, and RENDELL, <u>Circuit Judges</u>


James D. Arden
Melanie Berdecia
Samuel S. Choi  **[Argued]**
Eamon P. Joyce
Sidley Austin
787 Seventh Avenue
New York, NY 10019

                *Counsel for Petitioner*


Joseph H. Hunt
Assistant Attorney General, Civil Division
Song Park
Senior Litigation Counsel
Joseph A. O'Connell  **[Argued]**
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

                *Counsel for Respondent*

## O P I N I O N

**RENDELL**, <u>Circuit Judge</u>:

Gunawan Liem, an Indonesian national, petitions for review of the denial of his motion to reopen his removal proceedings. Although these motions are disfavored, the Board of Immigration Appeals (the "BIA") is still required to meaningfully consider the evidence and arguments presented by a petitioner and must explain its conclusions. Because the BIA failed to do so in this case, we will grant Liem's petition for review, vacate the order denying his motion to reopen, and remand to the BIA for further proceedings.

### I.

### A.

Liem is a native and citizen of Indonesia. He is also ethnically Chinese and a practicing Seventh Day Adventist Christian, making him a member of two minority groups in his country of origin. While in Indonesia, Liem witnessed and experienced persecution based on his belonging to these groups.[1] As a result, he sought refuge in the United States and,

---

[1] Liem has alleged three specific instances of persecution: First, he witnessed "Muslims . . . taking over the town [he] lived in" and "burning down Christian churches." AR 75. Second, his father, who conducted business buying and selling jewelry, was accused of having purchased stolen jewelry.

in 1999, was granted a six-month visa for vacationing. He stayed beyond the expiration of his visa and established a life here by obtaining gainful employment, marrying his wife, and fathering two American-born children. Most notably for our purposes, he has been an active congregant of his local church, the First Indonesian Seventh-Day Adventist Church, and has also served the church as a deacon.

In 2003, approximately four years after entering the United States, Liem filed an application for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture (the "CAT"). The Immigration Judge (the "IJ") denied his application for asylum as untimely but granted withholding of removal. Although the IJ expressed some doubt as to whether Liem would be in "direct danger" if he returned to Indonesia, he resolved the issue in favor of Liem because he "[was] not willing to take any chances at th[e] moment and . . . [Liem] [wa]s asking only for temporary protection." AR 832–33. The Government appealed, and the BIA vacated the IJ's ruling because Liem "failed to meet his burden of proof to establish that there is a clear probability that he would be persecuted if returned to Indonesia." AR 770. Accordingly, the BIA ordered Liem removed to Indonesia. Liem did not petition for review of that order. Instead, he filed a motion to stay his removal and reopen the proceedings, referencing a continued "pattern of anti-Chinese harassment and persecution [and] . . .

---

Liem claims that the police did not find his father credible because he was Chinese. Third, a mob attacked Liem on his way home from work because of his Chinese ethnicity. The mob forced him out of his car, took his wallet, and physically assaulted him.

a pattern of anti-Christian persecution." AR 634. The BIA denied this motion, citing U.S. State Department findings of a decrease in discrimination against Chinese Christians in Indonesia. Liem petitioned this Court for review of that order, and we denied his petition. *Liem v. Att'y Gen.*, 280 F. App'x 206, 209 (3d Cir. 2008) (per curiam).[2]

In early 2018, ICE agents arrested Liem and initiated the process of removing him to Indonesia. Liem filed a second motion to reopen his removal proceedings, this time claiming that, since the time of his merits hearing in 2003, conditions for Chinese Christians had materially deteriorated to an extent warranting reopening, despite the temporal and numerical limitations on motions to reopen.[3] In his motion, Liem urged that various international agencies "have reported that the level of hatred and Islamic extremism directed at Indonesian Christians on the grassroots level is rising, and the government of Indonesia is unwilling to act for fear of reprisals from the far-right Islamist groups." AR 31. He also highlighted, among other things, Indonesia's laws prohibiting blasphemy, which are markedly ambiguous and have been used against religious minorities, as well as the implementation of Sharia law in part of the country. Liem supported his claim of materially changed

---

[2] We held that we lacked jurisdiction to consider Liem's arguments that challenged the BIA's earlier vacating of his withholding of removal, since he did not directly petition for review of that order. *Liem*, 280 F. App'x at 209. We also rejected his due process claim and his argument that the BIA abused its discretion in denying his motion to reopen. *Id.*

[3] Liem also urged that his CAT claim was never adjudicated because his prior counsel was ineffective. Because this claim is not featured in his petition for review, we will not address it.

5

country conditions with numerous exhibits[4] and referenced several specifically in his motion to reopen.[5]

---

[4] Those exhibits, totaling about 190 pages, are as follows:

- Exhibit II: *Indonesian Christian whipped for selling sharia-banned booze*, Channel NewsAsia (Jan. 19, 2018) (describing public whipping of Christian man for selling illegal alcohol);
- Exhibit JJ: Michael Levenson, *For judge, these immigrants in US are like Jews fleeing Nazis*, Boston Globe (Jan. 18, 2018) (describing district court opinion staying deportation of approximately fifty Indonesian Christians);
- Exhibit KK: U.S. Dep't of State, Bureau of Consular Affairs, *Indonesia Travel Advisory* (Apr. 17, 2017) (instructing travelers to "[e]xercise increased caution in Indonesia due to terrorism" (emphasis omitted));
- Exhibit LL: Amnesty International, *Indonesia*, *Amnesty International Report 2016/17: The State of the World's Human Rights* (2017) (describing, among other things, Indonesia's blasphemy laws and use of caning as a punishment);
- Exhibit MM: Human Rights Watch, *Indonesia*, *World Report 2017* (2017) (summarizing, among other things, treatment of religious minorities in Indonesia);
- Exhibit NN: Matt Ozug & Ari Shapiro, *'It's Our Right': Christian Congregation In Indonesia Fights To Worship In Its Church*, NPR (Nov. 1, 2017) (reporting on ongoing fourteen-year struggle to open a single church);
- Exhibit OO: Andreas Harsono, *Indonesia Sends Ominous Signal to Religious Minorities*, Human Rights Watch (Sept. 25, 2017) (reporting that Indonesia has not

6

repeated "ambiguous" blasphemy laws despite recommendation from United Nations to do so);

- Exhibit PP: James Hookway, *Curfews, Obligatory Prayers, Whippings: Hard-Line Islam Emerges in Indonesia; Conservative Islamic groups are using political activism and charity work to build wide support for Shariah-inspired laws*, Wall St. J. (Sept. 13, 2017) (detailing conservative Islamic groups' rise to power in Indonesia);
- Exhibit QQ: Ben Bland, *Indonesia's Chinese population fears rising ethnic tensions – Old wounds reopen in Muslim-majority nation as politicians and radicals stoke hostility*, Fin. Times (Aug. 14, 2017) (reporting increasing hostility against Chinese);
- Exhibit RR: Ryan Dagur, *Indonesian Muslims accuse Christian lawmaker of blasphemy*, UCA News (Aug. 11, 2017) (describing blasphemy accusations leveled against Christian politician Victor Laiskodat);
- Exhibit SS: Andreas Harsono, *The Toxic Impact of Indonesia's Abusive Blasphemy Law*, Human Rights Watch (Aug. 5, 2017) (detailing history and current use of Indonesia's blasphemy law);
- Exhibit TT: Christian Solidarity Worldwide, *Indonesia: Visit Report 10-23 May 2017* (2017) (detailing deterioration of "Indonesia's tradition of religious pluralism");
- Exhibit UU: Joe Cochrane, *Governor of Jakarta Withdraws Appeal of Blasphemy Sentence*, N.Y. Times (May 23, 2017) (describing conviction of Christian governor Basuki Tjahaja Purnama (also known as "Ahok") of blasphemy and the public's response to conviction);

- Exhibit VV: *UN experts urge Indonesia to free jailed politicians, repeal its blasphemy law*, UN News Centre (May 22, 2017) (reporting that United Nations human rights experts urged Indonesian government to repeal blasphemy law and release Ahok);
- Exhibit WW: Olivia Tasevski, *Anti-Chinese and anti-Christian sentiment is not new in Indonesia*, The Conversation (May 17, 2017) (describing Ahok's conviction and Indonesia's history of discrimination against Christians and Chinese);
- Exhibit XX: *Indonesia Islam: Governor's blasphemy conviction divides a nation*, BBC (May 9, 2017) (reporting on Ahok's conviction and public's response);
- Exhibit YY: U.S. Comm'n Int'l Religious Freedom, *2017 Annual Report: Indonesia* (Apr. 2017) (reporting Commission's findings on treatment of religious minorities in Indonesia);
- Exhibit ZZ: *Religion, power and politics in Indonesia*, BBC (Apr. 20, 2017) (explaining role of religion in Indonesian politics);
- Exhibit AAA: Yenni Kwok, *Conservative Islam Has Scored a Disquieting Victory in Indonesia's Normally Secular Politics*, Time (Apr. 20, 2017) (describing ways in which religion emerged in 2017 election for Jakarta's governor);
- Exhibit BBB: Safrin La Batu, *Jokowi accused of promoting secularism*, Jakarta Post (Mar. 27, 2017) (reporting negative backlash received by Indonesian president after call for separation of religion and politics);
- Exhibit CCC: *Ahok trial: The blasphemy case testing Indonesian identity*, BBC (Feb. 14, 2017) (describing

"rising trend of conservativism" and increased intolerance towards religious minorities and Chinese in context of Ahok's trial for blasphemy);

- Exhibit DDD: *Jakarta vote: Indonesia hardliners call for Muslim governor*, BBC (Feb. 11, 2017) (reporting on Indonesian Muslims' campaign against Ahok);
- Exhibit EEE: Sana Jaffrey, *Justice by numbers*, New Mandala (Jan. 12, 2017) (reporting on increase in vigilantism in Indonesia);
- Exhibit FFF: *Firm action needed to curb growing intolerance: Wahid Foundation*, Jakarta Post (Dec. 23, 2016) (summarizing Wahid Foundation report on increased intolerance and radicalism in Indonesia);
- Exhibit GGG: *Indonesian scholars stand up against growing intolerance*, Jakarta Post (Dec. 23, 2016) (reporting on Indonesian scholars' response to growing intolerance);
- Exhibit HHH: Margareth S. Aritonang, *Indonesians increasingly blame the weak: Scholar*, Jakarta Post (Dec. 22, 2016) (reporting on "growing trend of discriminating against the country's minorities and marginalized communities");
- Exhibit III: Marguerite Afra Sapiie, *Indonesian Police assert control over MUI fatwas*, Jakarta Post (Dec. 21, 2016) (describing police involvement in dissemination of fatwas);
- Exhibit JJJ: Azis Anwar Fachrudin, *INSIGHT: Politics of Muslim identity over Santa outfits*, Jakarta Post (Dec. 20, 2016) (detailing 2016 fatwa barring Muslims from wearing "non-Muslim religious attributes" and explaining ways in which it is more extreme than past Christmas fatwas);

9

The BIA, in a single member opinion, denied the motion to reopen. In this opinion, after noting the standard for granting

- Exhibit KKK: *Indonesian protests awaken fears*, Associated Press (Dec. 2, 2016) (describing movement against Ahok and how it has sparked increased intolerance of Christians and Chinese);
- Exhibit LLL: *Indonesia protest: Jakarta anti-governor rally turns violent*, BBC (Nov. 4, 2016) (reporting on outbreaks of violence at anti-Ahok rallies);
- Exhibit MMM: Nivell Rayda, *Survey Reveals Worrying Religious Conservatism Among High School Students*, Jakarta Globe (May 25, 2016) (reporting findings on study investigating religious conservativism of high school students);
- Exhibit NNN: Robert P. George & Hannah Rosenthal, *Rampant religious persecution against atheists: Robert P. George*, USA Today (May 3, 2016) (noting use of Indonesia's blasphemy law against atheist);
- Exhibit OOO: Jonathan Emont, *Islamist Intolerance Poses a Growing Threat to Indonesia's Minorities*, Time (Apr. 20, 2016) (describing violence perpetrated by Indonesian Muslims against minorities);
- Exhibit PPP: Mike Thomson, *Is Indonesia winning its fight against Islamic extremism?*, BBC (Dec. 19, 2015) (describing extreme increase in visibility of conservative Islam in Indonesia); and
- Exhibit QQQ: *Church relocation threatens pluralism: GKI Yasmin*, Jakarta Post (Dec. 7, 2015) (reporting on attempted government relocation of a church).

[5] In his motion, Liem cites to Exhibit II, Exhibit KK, Exhibit LL, Exhibit MM, Exhibit NN, Exhibit OO, Exhibit PP, Exhibit QQ, Exhibit RR, and Exhibit SS.

untimely and number-barred motions to reopen, it concluded—without explanation—that Liem "offers little comparison between the country conditions or circumstances in 2003 and the current conditions or circumstances." A. 1. The BIA stated:

> In any event, the respondent has not shown material changes in country conditions or circumstances in Indonesia since either 2003 or 2015/2016. The Department of State's 2016 Indonesia International Religious Freedom Report shows that the constitution of Indonesia guarantees freedom of religion and the right to worship according to one's own beliefs but allows the government to impose some legal restrictions.[] The articles and reports submitted by the respondent show that discrimination and violence against minority religions continue to exist in Indonesia; blasphemy laws have not been repealed despite recommendations by United Nations, but are still being enforced; and some Christian churches have problems with local governments and communities in connection with building relocation. However, the

11

documents also show that these conditions have been a longstanding problem in Indonesia, rather than materially changed conditions or circumstances (Motion Exhs. LL, MM-OO, SS, WW, YY). The respondent argues that the "recent enactment" of blasphemy laws target the Christian minority (Motion at 8). However, the evidence submitted shows that blasphemy laws were enacted in 1965 and the threat of blasphemy law is "nothing new" (Motion Exh. SS at 2). The respondent also argues that Indonesia's Chinese population fears rising ethnic tensions (Motion at 9). However, ethnic tensions have existed since Indonesia's independence, and ethnic tensions against Chinese minorities have flared up into violent outbursts periodically since the country's independence (Motion Exh. QQ).

A. 1–2. Based on this, the BIA concluded that Liem did "not show[] that conditions or circumstances in Indonesia changed materially, such that his motion falls within the motion to reopen time and number limitations" and denied his motion as untimely. A. 2. This petition for review followed.

12

B.

Shortly after the BIA denied Liem's second motion to reopen and while this petition was pending, the First Circuit issued a precedential opinion in a factually related case, *Sihotang v. Sessions*, 900 F.3d 46 (1st Cir. 2018). There, the petitioner, an evangelical Christian from Indonesia, filed a motion to reopen his 2006 removal proceedings. *Id.* at 48–49. The BIA denied his motion "[i]n a terse one-and-a-half page opinion." *Id.* at 49. The First Circuit granted the petition and vacated and remanded because "the BIA's analysis [was] superficial." *Id.* at 50. The Court explained:

> In his motion to reopen, the petitioner asserted—and the government did not dispute—that the petitioner subscribes to a more particularized subset of the Christian faith: he is an evangelical Christian, for whom public proselytizing is a religious obligation. Yet, in terms of the prospect of persecution arising out of changed country conditions, the BIA wholly failed to evaluate whether and to what extent there is a meaningful distinction between Christians who practice their faith in private and evangelical Christians (such as the petitioner), for whom public proselytizing is a central tenet. So, too, the BIA neglected to consider whether

13

> country conditions had materially changed with respect to public and private reactions (including vigilante violence) toward evangelical Christians. Finally, the BIA neglected to consider whether attitudes in Indonesia had materially changed with respect to persons making public religious statements.

*Id.* at 50–51. The First Circuit concluded that this error was not harmless because "[t]he record [wa]s replete with copious new evidence submitted by the petitioner and unavailable in 2006, which might well serve to ground a finding (or at least a reasonable inference) that country conditions have steadily deteriorated over the past twelve years." *Id.* at 51. In this vein, the Court detailed facts reflected in the evidence that the BIA "completely overlooked." *Id.* Many of these facts applied to evangelical and non-evangelical Christians alike, including the enactment of Sharia legislation in 2008, the prevention of thousands of Christians from attending Easter mass in 2010 by Muslim extremists and the local government, and demands from over 1,500 Muslims that a Christian found guilty of blasphemy be executed in 2011. *Id.* at 51–52. The Court specifically noted the increased "Islamic fundamentalist fervor" that might put evangelical Christians "at special risk in Indonesia" and distinguished this case from prior cases because of the "especially sharp increase in governmental and private persecution of Indonesian Christians between 2014 and 2017—a period not under review in any of [our] prior cases." *Id.* at 51, 53.

14

In the wake of *Sihotang*, the same member of the BIA who denied the motion to reopen that is the subject of this petition issued at least eight unpublished decisions granting reopening of removal proceedings for Indonesian Christians. *See* ADD 1–17. One of these decisions is within our circuit. *See* ADD 16 (Newark, NJ). In each decision, that member determined that conditions in Indonesia had materially changed from a period starting between 2004 and 2009 and ending in 2018. And although the member cited to *Sihotang* in at least seven of these opinions, none of them appear to hinge on whether the movant was an evangelical Christian or a Christian who practices privately. Instead, the BIA concluded generally that "conditions confronting Christians in Indonesia have deteriorated and intensified between [the movants'] prior hearing[s] . . . and the filing of [their] motion[s to reopen] . . . ." ADD 8; *accord* ADD 16–17.

## II.

The BIA had jurisdiction over Liem's motion to reopen under 8 C.F.R. § 1003.2. We have jurisdiction over his petition for review pursuant to 8 U.S.C. § 1252. We review the denial of a motion to reopen for abuse of discretion and will not disturb the BIA's decision "unless it is found to be arbitrary, irrational, or contrary to law." *Zhu v. Att'y Gen.*, 744 F.3d 268, 271 (3d Cir. 2014) (quoting *Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004)) (internal quotation marks and alterations omitted). We also give deference to the BIA's evidentiary findings, *id.* at 272, and will uphold them if they are supported by substantial evidence, *Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir. 2002). Nonetheless, as we discuss more fully below, the BIA has a heightened duty "to explicitly consider any country conditions evidence submitted by an applicant that

materially bears on his claim." *Zheng v. Att'y Gen.*, 549 F.3d 260, 268 (3d Cir. 2008).

### III.

We begin our analysis by reviewing the legal principles at play. Then, we proceed to the merits of Liem's claim.

### A.

8 U.S.C. § 1229a(c)(7) and 8 C.F.R. § 1003.2(c)(2) require that motions to reopen removal proceedings be filed within ninety days of the date of entry of the final order concluding the proceeding to be reopened, and they limit a party to one motion to reopen. However, these temporal and numerical limitations do not apply where a petitioner moves

> [t]o apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing.

8 C.F.R. § 1003.2(c)(3)(ii). Because Liem's motion to reopen at issue in this case falls under this provision, he was required to provide evidence of materially changed conditions in Indonesia from the time of his merits hearing in 2003 to the time of his latest reopening hearing in 2018. *See Zhu*, 744 F.3d at 278.

In reviewing Liem's second motion to reopen, the BIA was obliged to "meaningfully consider[] the evidence and arguments [Liem] presented." *Id.* (citation omitted). The BIA did not have to "expressly parse each point or discuss each piece of evidence presented," but it could not ignore evidence favorable to Liem. *Id.* (citations and internal quotation marks omitted). "To [show that it] fulfill[ed] this requirement, the BIA must [have] provide[d] an indication that it considered such evidence, and if the evidence is rejected, an explanation as to why it was rejected." *Id.*

We have acknowledged the "inherent tension" between the necessity of the BIA to indicate that it has considered all of the evidence while not needing to expressly parse or discuss each piece of evidence. *Zheng*, 549 F.3d at 268. Nevertheless, and as noted above, the BIA has "a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim." *Id.* (quoting *Guo v. Gonzales*, 463 F.3d 109, 115 (2d Cir. 2006)) (internal quotation marks omitted). This duty is heightened for motions to reopen based on changed country conditions. *See id.* (citations omitted).

Several of our precedential opinions elaborate on the nature of this scrutiny. Two cases in which we vacated BIA denials of untimely and number-barred motions to reopen are particularly relevant. The first, *Zheng v. Attorney General*, involved two petitions for review of these denials. *Id.* at 261. In the case of the first petitioner, we identified two errors in the BIA's opinion: First, the BIA "did little more than quote passages from [an] earlier decision . . . without identifying— let alone discussing—the various statements contained in the record before it . . . ." *Id.* at 268. Second, the BIA failed to discuss most of the evidence presented by that petitioner. *Id.*

17

We also noted that the Eleventh Circuit had come to a contrary conclusion about the content of some of the same documents presented as evidence in a factually similar case. *Id.* at 269. As to the second petitioner, we determined that the BIA's terse explanation of its decision "amount[ed] to a series of conclusory statements" and faulted the BIA for its failure to discuss most of the evidence submitted and its failure to explain why that evidence was insufficient to show materially changed country conditions. *Id.* at 270–71. We granted the petitions for review, vacated the BIA's orders, and remanded for the BIA to rectify these procedural deficiencies. *Id.* at 272.

In *Zhu v. Attorney General*, our most recent precedential opinion addressing this issue, we vacated the BIA's order for two reasons: First, the BIA did not demonstrate that it had examined and considered all of the evidence presented by the petitioner by either failing to address certain evidence entirely or failing to explain why it rejected other evidence. *Id.* at 274–76. Second, the BIA ignored statements in reports to which it cited that supported the petitioner's position, and failed to discuss why it found those statements unpersuasive but others in the same reports persuasive. *Id.* at 277–78. We concluded that "the BIA failed to 'announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.'" *Id.* at 278 (quoting *Ni v. Holder*, 715 F.3d 620, 631 (7th Cir. 2013)). Accordingly, we granted the petition for review, vacated the BIA's order, and remanded for full consideration of all of the evidence presented. *Id.* at 279.

18

B.

We now turn to Liem's claim. Liem urges that the BIA abused its discretion by, first, selectively citing to the record in concluding that he failed to show a material change in country conditions and, second, by failing to meaningfully consider other evidence that supports his position.

The BIA cited to seven of the thirty-five exhibits submitted by Liem in support of his claim of materially changed country conditions. Based on those seven exhibits, but without even a cursory review or description of them, it determined that "conditions [for Chinese Christians] have been a longstanding problem . . . in Indonesia, rather than materially changed conditions or circumstances." A. 2 (citing Emergency Stay of Removal and Mot. to Reopen Exhs. LL, MM-OO, SS, WW, YY). Instead of explaining how it reached this conclusion, in the remainder of its opinion, the BIA quibbled with a factual inaccuracy in Liem's motion and dismissed rising ethnic tensions against Chinese as one of many periodic flare-ups that have occurred in Indonesia since it gained its independence. "[A]s a result, the BIA failed to 'announce its decision in terms sufficient to enable [us] to perceive that it has heard and thought and not merely reacted.'" *Zhu*, 744 F.3d at 278 (quoting *Ni*, 715 F.3d at 631). Even if the BIA reached the correct conclusion, its failure to explain why Liem's evidence did not show materially changed conditions constituted an abuse of discretion. *See id.*

Moreover, three of the seven exhibits cited by the BIA contain statements contrary to its conclusion. First, Exhibit LL explains that caning "was applied to non-Muslims *for the first time* in April [of 2016] when a *Christian* woman received 28

19

strokes of the cane for selling alcohol."[6]  AR 413 (emphasis added).  Second, Exhibit NN discusses "Indonesia's *growing* intolerance" of religious minorities, focusing specifically on Christians.  AR 430 (emphasis added).  Notably, that exhibit states that approximately 1,000 churches have been shut down in Indonesia between 2007 and 2017,[7] and that a church permitting effort that "start[ed] in 2003" has stalled.  AR 427, 431; *see also* AR 428 (discussing government defiance of an Indonesia Supreme Court decision favoring the church permitting).  Lastly, Exhibit YY asserts that "by many accounts, violations of the freedom of religion or belief continue to rise and/or increase in intensity, and experts believe many incidents go unreported."  AR 491.  That exhibit also discusses the recent discriminatory use of a 2006 regulation requiring houses of worship to gain certain community support before obtaining a permit for them to be built.  Fundamentalist Islamic groups have been exploiting this regulation to justify the closing of existing places of worship and to prevent the opening of new ones.  AR 493.[8]  Therefore, much like the BIA

---

[6]Exhibit II, which was not cited by the BIA but was cited by Liem in his motion, reports that, since this occurrence, caning has been applied to non-Muslims twice more.

[7]This number is particularly striking when compared with the closing of only 516 churches between 1945 and 1998.  *See* AR 1007.

[8]  The Government contends that Exhibit YY, the U.S. Commission on International Religious Freedom's 2017 Report, shows that Indonesia's conditions have not materially changed over the relevant time period because the Commission has listed Indonesia as a "Tier 2" country since 2004.  We reject this argument for three reasons:  First, the BIA did not adopt this reasoning below, and "[w]e are bound to review the

in *Zhu*, the BIA in this case ignored statements in exhibits to which it cited that support Liem's position, and it failed to explain why it found these statements unpersuasive and others in the same exhibits persuasive. *Zhu*, 744 F.3d at 277–78; *see also Ni*, 715 F.3d at 627 ("Why the BIA found the Reports' discussion of certain 'administrative punishments' and coercive tactics to be persuasive, but found the Reports' discussion of forced sterilizations and abortions in Fujian Province not to be persuasive, however, remains a mystery.").

The shortcomings of the BIA's opinion do not end here. In addition to these deficiencies, the BIA failed to even mention the vast majority of the exhibits submitted by Liem. (There are twenty-eight uncited and unmentioned exhibits, to be exact.)  Many of the unaddressed exhibits provide support for his contention that conditions in Indonesia have materially

---

agency's decision based solely on the stated grounds for that decision." *Zheng v. Gonzales*, 422 F.3d 98, 122 (3d Cir. 2005). Second, 2004 is not the relevant year of comparison, since Liem's most recent merits hearing occurred in 2003. Third, we doubt that proving material change requires that a country move from Tier 2 to Tier 1, or "countries of particular concern."  U.S. Comm'n Int'l Religious Freedom, *2017 Annual Report* 3 (2017).  The Commission defines Tier 2 countries as those whose religious freedom violations meet one or two of these elements: (1) systematic, (2) ongoing, or (3) egregious. *Id.* Tier 1 countries are those whose violations meet all three elements. *Id.* Therefore, a country like Indonesia can maintain Tier 2 status even though its religious freedom violations worsen either (a) by fulfilling only one element to fulfilling two, or (b) by *barely* meeting an element (or two) to definitively doing so.

changed since 2003. A number of them generally reference Indonesia's "*growing* trend of discriminating against the country's minorities and marginalized communities." AR 542 (emphasis added); *see also* AR 443 (addressing the "*rising* intolerance" against Chinese Indonesians (emphasis added)). For example, contrary to the BIA's assertion that "the constitution of Indonesia guarantees freedom of religion and the right to worship according to one's own beliefs," A. 1, Exhibit TT states that "*[i]n recent years* Indonesia's strong and proud pluralistic tradition [of freedom of religion or belief], rooted in the heart of the constitution, has come under threat," AR. 458 (emphasis added).[9] That same exhibit reports that in 2017, "the Indonesian National Commission for Human Rights . . . published a report detailing *a steady increase* in [freedom of religion or belief] violations in recent years." AR 459

---

[9] We remind the BIA that its duty to not cherry-pick evidence extends to State Department country reports. *See Berishaj v. Ashcroft*, 378 F.3d 314, 320 (3d Cir. 2004) (stating that the BIA must "address the relevant country report in some detail"), *abrogated on other grounds by Nbaye v. Att'y Gen.*, 665 F.3d 57 (3d Cir. 2011). Here, the BIA took administrative notice of the State Department's 2016 Indonesia International Religious Freedom Report to describe Indonesia's constitution and the government's power "to impose some legal restrictions" on religion. A. 1–2, n. 1. But the BIA ignored facts from the report that suggest a rising intolerance against Christians. *See, e.g.*, U.S. Dep't of State, Bureau of Democracy, H.R. and Lab., *International Religious Freedom Report: Indonesia* 1, 8 (2016) (documenting blasphemy charges against Jakarta governor Ahok and the caning that marked "the first time a non-Muslim was punished under Aceh's special [S]haria-based law").

(emphasis added). Other exhibits offer more specific illustrations of changes, including the following:

- Exhibit PP, a Wall Street Journal article, details the rise of "[h]ard-line Islamic groups," including the Islamic Defenders Front (known in Indonesia as the "FPI"). AR 438. The article explains that the FPI "stepped into the national scene in the mid-2000s" and has since gained significant influence over Indonesian politicians and their constituents. AR 440. "In recent years, lobbying groups such as the [FPI] have helped introduce more than 400 Sharia[]-inspired laws . . . , including those that penalize adultery, force women to wear headscarves and restrict them from going out at night." AR 438. In addition, the FPI "successfully lobbied Indonesia's Supreme Court in 2013 to overrule the government and allow local authorities to restrict sales of alcohol, arguing it was eating away at traditional Islamic values." AR 440. As of 2017, the group maintained offices in thirty of the thirty-four Indonesian provinces and had conducted extensive outreach through, among other things, prayer rallies and charitable projects. The article provides that, through this "strong presence" in the community, the FPI has been able to achieve great political power because, as one interviewee put it, "[t]he politicians don't have much choice but to follow." AR 440 (internal quotation marks omitted). It concludes with a timeline detailing the rise of the FPI from 1998 to 2016. Most notably, at the time of Liem's merits hearing in 2003, the founder of the FPI was imprisoned "for inciting his followers to smash up bars and other entertainment venues the FPI deem[ed] immoral." AR

23

441. By 2015 and 2016, however, the group had effectuated a national ban on alcohol sales at convenience stores and "accuse[d] Jakarta's Christian governor . . . of blasphemy, setting off a series of mass protests that ultimately led to the governor's defeat in his re-election bid [that] year," *id.*, and his conviction and imprisonment for blasphemy.

- A number of exhibits address the blasphemy conviction and imprisonment of the former governor of Jakarta, Basuki Tjahaja Purnama (also known as "Ahok"). Ahok, a Chinese Christian, became a governor by succession, not election. In a speech during his 2016 campaign to be elected in his own right for a successive term, he cited a passage from the Quran to persuade Muslims that voting for a non-Muslim candidate was acceptable. Hard-line Islamic groups incited major protests, where they accused Ahok of blasphemy and "demand[ed] that he be jailed or executed." AR 470. Under extreme public pressure, Indonesian police ultimately arrested Ahok for blasphemy, for which he was subsequently tried, convicted, and sentenced to two years in prison. Although this is a specific and singular incident of use of the country's blasphemy laws against a Christian, a few of the exhibits supplied by Liem indicate that Ahok's conviction is "symbolic of rising religious intolerance in Indonesia." AR 456. Others show that the incident has borne increased public hostility against ethnically Chinese Indonesians. *See* AR 554 ("The movement against [Ahok] . . . has overflowed with racial slurs against his Chinese ancestry, an unnerving sign in a country with a history of lashing out violently against the ethnic minority."); AR 521 ("[O]penly anti-Chinese speeches at the anti-

24

Ahok rallies and growing racism on social media have many ethnic Chinese concerned. There is even talk among some about leaving the country if the government does not provide the necessary security."); AR 561 ("The campaign against [Ahok] has since taken on anti-Chinese overtones."). This hostility is, in some ways, "unprecedented." AR 511 ("Muslim clerics have launched a campaign to deny proper burial rights to deceased Muslims who had voted for Ahok . . . .").

- Some exhibits demonstrate an increase in enforcement of Indonesia's blasphemy laws. *See* AR 501 (stating that between 2005 and 2017, no one charged with blasphemy was acquitted, and implying that some of those charged prior to 2005 had been acquitted); AR 446–47 (reporting that accusations similar to those that Ahok was charged with were levied against another Christian politician).

- Others discuss the very recent use of caning as a punishment for non-Muslims. It was applied against a non-Muslim—in that case, a Christian—*for the first time* in April of 2016. Since then, it has been applied against non-Muslims two more times.

- A number of exhibits point to "the [recent] mainstreaming of extremist positions." AR 443; *see also* AR 506 ("The coalescing of an Islamic vote is a surprisingly new development in a political scene that has always been dominated by secular parties."); AR 492 ("Some Indonesians are concerned by what they perceive is the 'Arabization' or 'creeping Islamization' of the country's more pluralistic form of Islam.").

25

By failing to address these exhibits—let alone merely acknowledge them—the BIA contravened our mandate that it show that it considered the entire evidentiary record, *see Zheng*, 549 F.3d at 269–70 (remanding because the BIA "fail[ed] to discuss most of the evidentiary record" for both petitioners), and clearly did not fulfill its heightened duty to "consider any country conditions evidence submitted by [Liem] that materially bears on his claim," *id.* at 268 (quoting *Guo*, 463 F.3d at 115) (internal quotation marks omitted). To be sure, the BIA was not required to cite to every exhibit provided by Liem. However, given the strength of the abovementioned evidence in favor of Liem's position, it was required to meaningfully account for it in some way.

The fact that the First Circuit has suggested that conditions for Christians in Indonesia have materially changed since 2006 and that there has been "an especially sharp increase in governmental and private persecution of Indonesian Christians between 2014 and 2017" also gives us pause. *Sihotang*, 900 F.3d at 53. The Government attempts to distinguish *Sihotang*, arguing that its holding rested on the BIA's failure to evaluate the petitioner's claim as one of changed country conditions for *evangelical* Christians rather than Christians who practice their faith privately. The Government urges that because Liem did not argue that he is an evangelical Christian for whom proselytizing is a requirement, *Sihotang* is not on point. But the Government's view of *Sihotang* and the facts here is too narrow. As noted above, the Court's ruling in *Sihotang* rested in large measure on the changed country conditions in Indonesia for *all* Christians. *See id.* at 51–52. Moreover, to the extent its ruling rested on the distinction between those who practice their faith privately and those who practice publicly, there is evidence

26

here that Liem's faith may involve a similarly public component.  In his second motion to reopen, Liem submitted a letter from his pastor stating that he is a deacon in his church who "takes care of [] church services" and "meet[s] the needs of the people in the community."  AR 80.  This was reinforced by letters provided by several parishioners.  The Government did not dispute these facts.  Therefore, the increase in religious intolerance in Indonesia reflected in the record might be "uniquely problematic" for Liem, since he is a minister in his community, thus practicing his Christian faith publicly.  *Sihotang*, 900 F.3d at 53.  Moreover, in light of the decisions rendered by the BIA member in this case after *Sihotang* was published, we question whether the BIA would have a view of this case now that differs from its view of the record eleven months ago.  *See Shardar v. Att'y Gen.*, 503 F.3d 308, 315 (3d Cir. 2007) ("Administrative agencies must apply the same basic rules to all similarly situated supplicants." (quoting *Henry v. INS*, 74 F.3d 1, 6 (1st Cir. 1996)).

In sum, the BIA "appears to have completely overlooked critical evidence" when it failed to explain how it reached its conclusion and failed to even acknowledge evidence contrary to its position in both the exhibits it cited and those it did not cite.  *Sihotang*, 900 F.3d at 51.  Under our precedent, these deficiencies constituted an abuse of discretion.[10]

---

[10] In his petition for review, Liem also argues that he established a *prima facie* case for withholding of removal.  Because the BIA did not reach this issue, we refrain from addressing it in the first instance.  *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam).

## IV.

Because the BIA did not explain its conclusion and did not meaningfully consider much of the evidence presented by Liem, we will grant his petition for review, vacate the denial of his second motion to reopen, and remand to the BIA for further proceedings consistent with this opinion. In doing so, we do not decide whether Liem has shown materially changed conditions in Indonesia warranting reopening of his removal proceedings. Rather, we conclude that the abovementioned evidence contradicting the BIA's determination is strong enough to require the BIA to afford it more thorough consideration. We remand for the BIA to meet its heightened duty and meaningfully consider *all* of the evidence, which may or may not yield a different result.