NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1340
_____

TJOO KIAT NG,
                         Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A095-432-666)
Immigration Judge:  Charles M. Honeyman
_____

Argued October 2, 2020

Before:  SHWARTZ, PHIPPS, and FISHER, *Circuit Judges*.

(Filed: November 12, 2020)
_____

OPINION*
_____

Christopher M. Casazza     [ARGUED]
Palladino, Isbell & Casazza
1528 Walnut Street, Suite 1701
Philadelphia, PA 19102
        *Counsel for Petitioner*

_____

        * This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Ethan P. Davis, Acting Assistant Attorney General
Anthony C. Payne, Assistant Director
Joseph D. Hardy, Jr., Trial Attorney    [ARGUED]
Neelam Ihsanullah
Anthony C. Payne
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

FISHER, *Circuit Judge*.

Petitioner Tjoo Kiat Ng, a native and citizen of Indonesia and an ethnically Chinese Catholic, seeks review of the Board of Immigration Appeals' denial of his motion to reopen his immigration proceedings, in which he was found removable to Indonesia. Because the BIA denied Ng's motion for failing to make a *prima facie* case (and not for a purely discretionary reason) yet failed to meaningfully engage with the record and explain its reasons for rejecting Ng's evidence of changed country conditions, and because its decision contravenes *Liem v. Attorney General*, 921 F.3d 388 (3d Cir. 2019), we will grant the petition for review, vacate the BIA's order, and remand for full consideration of the evidence.[1]

A motion to reopen must be filed within 90 days after the entry of a final order of

---

[1] The BIA had jurisdiction under 8 C.F.R. § 1003.2(a). We have jurisdiction to review the BIA's denial of Ng's motion to reopen under 8 U.S.C. § 1252(a)(1). We review the denial for an abuse of discretion; however, "questions of law, such as whether the BIA applied the correct legal standard in considering the motion to reopen . . . , are . . . reviewed de novo." *Fadiga v. Att'y Gen.*, 488 F.3d 142, 153-54 (3d Cir. 2007).

removal. 8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. § 1003.2(c)(2). However, this deadline does not apply "where a petitioner moves '[t]o apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality . . . if such evidence is material and was not available and could not have been discovered or presented at the previous hearing.'" *Liem*, 921 F.3d at 395 (quoting 8 C.F.R. § 1003.2(c)(3)(ii)). Invoking this exception, Ng argues that, in denying his motion, the BIA (i) abused its discretion by failing to meaningfully consider the evidence, (ii) erred in distinguishing *Liem* and *Sihotang v. Sessions*, 900 F.3d 46 (1st Cir. 2018) on the basis that Ng is Catholic, and (iii) applied an improper standard. Ng's first two arguments are well-founded and necessitate remand.

"[T]he BIA has 'a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim.'" *Liem*, 921 F.3d at 396 (quoting *Zheng v. Att'y Gen.*, 549 F.3d 260, 268 (3d Cir. 2008)). To satisfy this duty, which is "heightened for motions to reopen based on changed country conditions," *id.*, the BIA must meaningfully evaluate the evidence and "may not ignore evidence favorable to the alien." *Huang v. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010). If the BIA ultimately rules against a petitioner, it "should indicate its reasons for discrediting certain testimony or documentary evidence," *Toussaint v. Att'y Gen.*, 455 F.3d 409, 414 (3d Cir. 2006), and "'announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted,'" *Zhu v. Att'y Gen.*, 744

3

F.3d 268, 278 (3d Cir. 2014) (quoting *Ni v. Holder*, 715 F.3d 620, 631 (7th Cir. 2013)).

Here, the BIA has not done that. Its curt decision discussed only one of 54 exhibits Ng submitted, while dismissing the rest as "cumulative." App. 4. The BIA also failed to explain how it concluded that conditions in Indonesia have not changed for Christians since 2004. Such minimal review is plainly inadequate. *See Awolesi v. Ashcroft*, 341 F.3d 227, 229-32 (3d Cir. 2003) (rejecting "opaque" and incomplete explanations). Indeed, in *Liem*, we held that the BIA abused its discretion where it cited only seven of 35 exhibits, "without even a cursory review or description of them," to conclude that "conditions [for Chinese Christians] have been a longstanding problem . . . in Indonesia, rather than materially changed conditions." 921 F.3d at 396 (alteration in original) (citation omitted). Here, the BIA's decision was even more deficient, having cited only a single exhibit, the State Department's 2018 International Religious Freedom Report.

Even the BIA's handling of that exhibit is problematic. It pulled only a single fact from the Report—*i.e.* that Catholicism is one of six religions accorded official status in Indonesia—while ignoring material "favorable to the alien," *Huang*, 620 F.3d at 388, and "contrary to [the BIA's] conclusion," *Liem*, 921 F.3d at 397.[2] We reject such outcome-

---

[2] For example, the Report details violent acts directed at Christian churches and congregants, including Catholics; the targeting of Catholic churches with protests, vandalism, and extortion by "intolerant groups," App. 110-11; the government's failure to consistently "investigate and prosecute crimes by members of [such] 'intolerant groups,'" App. 108; the selective enforcement of blasphemy laws; and the government's limited steps to "uphold the constitutional and legal protections afforded to minority religious groups," *id*.

4

driven reasoning. *See Huang*, 620 F.3d at 388 ("The BIA's analysis does little more than cherry-pick a few pieces of evidence, state why that evidence does not support a well-founded fear of persecution, and conclude that Huang's asylum petition therefore lacks merit. That is selective . . . ."). Indeed, in *Liem*, we took issue with the fact that of the seven exhibits cited by the BIA, three "contain[ed] statements contrary to its conclusion." 921 F.3d at 397. Here, the BIA's decision is plagued by this same "shortcoming[]." *Id.* at 398.

The Government argues that the BIA adequately reviewed the evidence yet simply rejected Ng's reading of it, pointing to the BIA's statement that "[t]he intolerance [Ng] identifies has been a continuing and ongoing struggle" but "is not indicative of materially changed conditions." App. at 5. But, just a year ago, this Court evaluated a record containing some of the identical exhibits Ng presented, ultimately concluding that remand was warranted given the "strength" of the evidence of worsened conditions for Christians in Indonesia.[3] *Liem*, 921 F.3d at 400; *see also Sihotang*, 900 F.3d at 53 (noting "an especially sharp increase in governmental and private persecution of Indonesian Christians between 2014 and 2017"). Just as the record in *Liem* deserved further review, so too does this record.

---

[3] Indeed, both the record in *Liem* and the comparable record here show (i) a trend of increased hostilities toward minorities in Indonesia, (ii) the rise in political influence of extremist groups such as the Islamic Defender Front, (iii) the arrest and conviction of the Chinese Christian Governor of Jakarta, (iv) further enforcement of blasphemy laws, and (v) a mainstreaming of radicalized Islamist positions. *See Liem*, 921 F.3d at 398-400.

Remand is also warranted for a second reason. The BIA committed legal error when it misread *Liem* as applying only to Seventh Day Adventist Christians. Rather, *Liem* rejected the theory that certain Christian sects are subject to changed conditions, while others are not. 921 F.3d at 400. In fact, we specifically noted the evidence of "changed country conditions in Indonesia for *all* Christians," and rejected the Government's reading of *Sihotang* as limited to "evangelical Christian[s]." *Liem*, 921 F.3d at 400. We also noted that the BIA has itself cited *Sihotang* in several decisions recognizing worsened conditions in Indonesia, "none of [which] appear[ed] to hinge on whether the movant was an evangelical Christian." *Id.* at 395.

Nevertheless, the Government asserts that *Liem* and *Sihotang* are limited to Christians for whom public worship or proselytizing are religious obligations. The BIA, however, did not base its decision on whether Ng's faith involves public worship or proselytizing, and we cannot affirm a decision for reasons the BIA did not itself state.[4] *See Dia v. Ashcroft*, 353 F.3d 228, 241 (3d Cir. 2003) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). In addition, we must decide cases only on "the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A), and the record contains no evidence about whether public displays of worship and proselytizing are elements of Ng's Catholic faith. Accordingly, on remand, the parties should be allowed to

---

[4] For the same reason, any other bases for distinguishing *Liem* which are not found in the BIA opinion (*e.g.* that Liem was a deacon, 921 F.3d at 400) are of no relevance to our ruling on Ng's petition.

6

supplement the record with such evidence, and to brief whether it makes a difference under Third Circuit law.

The Government also argues that there is good reason to treat Catholics differently from other Christians because the Indonesian government officially recognizes Catholicism. But, the record shows that despite Catholicism's nominal recognition, Indonesian Catholics still face targeting, persecution, and terrorism just as other Christians do, and that the central government fails to enforce protections for Christian and Chinese minorities. Likewise, *Liem* and *Sihotang* support that recent persecutory acts would affect Christians across the board. *See Liem*, 921 F.3d at 394 ("Many of [the] facts [showing persecution in *Sihotang*] applied to evangelical and non-evangelical Christians alike, including the enactment of Sharia legislation in 2008, the prevention of thousands of Christians from attending Easter mass in 2010 . . . , and demands from over 1,500 Muslims that a Christian found guilty of blasphemy be executed in 2011.").

Finally, Ng contends that the BIA applied an improper standard of proof. He says that by requiring him to "establish" a pattern or practice of persecution of Chinese Christians in Indonesia, the BIA impermissibly expanded his obligation to set forth a *prima facie* case for reopening. Pet. Br. at 19. This argument, however, is merely semantic. The BIA's use of the word "establish" did not create a higher standard of proof. In fact, we too have used that word to describe a petitioner's burden. *See Pllumi v. Att'y Gen.*, 642 F.3d 155, 161 (3d Cir. 2011) ("[T]he BIA may deny a motion to reopen if it

7

determines the alien has not established a prima facie case . . . .").

For all of these reasons, we will grant the petition for review, vacate the BIA's order, and remand for more thorough consideration of the evidence.