**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2383
_____

TUNDE ALI ALAO,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA

_____

On Petition for Review of an
Order of the Board of Immigration Appeals
(Agency No. A087-946-900)
Immigration Judge: Andrew R. Arthur

_____

Argued:  April 14, 2021

Before:  CHAGARES, JORDAN, and SCIRICA, Circuit Judges

(Opinion filed: May 20, 2021)

Ben Arad [ARGUED]
Jillian Berman
Lankler Siffert & Wohl LLP
500 Fifth Avenue, 34th Floor
New York, NY 10110

Zoey Jones
Brooklyn Defender Services
156 Pierrepont Street
Brooklyn, NY 11201

        Counsel for Petitioner

Alison Marie Igoe, *Senior Counsel for National Security* [ARGUED]
Daniel I. Smulow, *Senior Counsel for National Security*
Sarah L. Martin
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

       Counsel for Respondent

————————

OPINION[*]

————————

CHAGARES, Circuit Judge.

Tunde Ali Alao petitions this Court to review a decision of the Board of Immigration Appeals (the "BIA") denying his second motion to reopen after the Immigration Judge ("IJ," and collectively with the BIA, "agency") denied his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Because the BIA did not meaningfully consider the evidence Alao submitted in support of his motion, we will grant the petition for review, vacate the order denying the motion to reopen, and remand to the BIA for further proceedings.

I.

We write solely for the parties' benefit, so our summary of the facts is brief. Alao is a Nigerian citizen. His father was a senior leader of a militant Islamic organization,

[*]     This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

known as "Sheriff,"[1] in Jos, Nigeria. Alao lived with his father in Jos when he was a child but later moved in with his sister,[2] who was Christian and also lived in Jos. Alao converted from Islam to Christianity during this time. He returned to his father's house after he completed secondary school, but his father told him that he should either join Sheriff or leave. Alao chose to return to his sister's home and began working at a church.

There were violent clashes between Jos's Christian and Muslim populations in 2003 and 2004. Alao testified that, although he did not physically harm anyone, he participated in some of the 2003 riots and helped other Christians destroy property that belonged to Muslims. Alao's father lived in one of these properties. Alao believed that his father, Sheriff members, and the state government were looking for him because of his involvement in these riots. When Alao was temporarily out-of-town in 2004, his sister and her family were killed and their home destroyed. Alao believed that Sheriff members were responsible for their deaths and that they were targeting him as well. He subsequently sought to warn his church of a possible attack only to find that a mob was attacking and destroying the church. Alao's friend brought him to a nearby military

---

[1]     There appear to be multiple spellings for the group known as "Sheriff." See, e.g., A.R. 599–600 (referring to group as "Shar'iff"); A.R. 1034 ("Sherriff"). For consistency, we will use "Sheriff," the spelling most frequently used in the parties' papers and agency's decisions.

[2]     Alao testified that he lived with his sister and her family, and the Immigration Judge's decision and Alao's opening brief also state that Alao lived with his sister. Alao's second motion to reopen, however, states that Alao lived with his aunt's family. This factual difference is not material, and we will refer to Alao's relative as his sister.

barracks where Alao stayed until he traveled to Lagos and ultimately the United States in 2007.

The Department of Homeland Security ("DHS") placed Alao in removal proceedings in 2010 after he overstayed his B-2 tourist visa. Alao was held at the York County Prison during these proceedings. The prison staff placed Alao on suicide watch a few weeks before his merits hearing, and Alao's medical records show that he was paranoid, suffered from hallucinations, and believed staff members were trying to poison him. DHS did not inform the IJ of these incidents.

The IJ granted several continuances to give Alao an opportunity to retain counsel, post bond, and apply for asylum. The IJ also informed Alao that he had the right to an attorney. Alao attempted to retain counsel but was unsuccessful and decided to represent himself. In subsequent proceedings, however, Alao expressed interest in hiring an attorney, and the IJ continued the case so that Alao could "keep looking for a lawyer." Admin. Rec. ("A.R.") 756. Alao was still unable to retain counsel by the next hearing. When Alao explained that he could not find a lawyer to help him with his asylum application, the IJ responded that: "You don't need a lawyer, sir. It's [a] very straightforward application, and you speak English." A.R. 765. Alao explained once more that he did not have a lawyer, and the IJ repeated that Alao did not "need a lawyer" because "I [the IJ] know the questions to ask in order to make sure that you get [relief] if you need it." A.R. 768. Although the IJ asked Alao again if he wanted to continue to represent himself, the IJ only did so at the end of the merits hearing when he issued his oral decision.

4

Alao did not request or use a translator during his removal proceedings and apparently struggled to communicate orally. For instance, when the IJ asked Alao to affirm that he would testify truthfully, Alao responded that he got married in the United States before later explaining that he did not understand the question. When asked if he understood the purpose of his removal proceedings, Alao responded that he wanted to "stay here because I got a bond before." A.R. 707–08. He also testified that the Nigerian Government wanted to harm him because he was Nigerian. Only after the IJ asked several follow-up questions — including "[y]ou sure?" — did Alao clarify that the Nigerian Government did not want to harm him on the sole ground that he was a citizen of Nigeria. A.R. 826–27. Alao also responded to a question about his political beliefs by saying that he was not religious, even though the question did not concern his religion and Alao was Christian. At one point during these proceedings, counsel for the Government asked whether Alao had completed his asylum application by himself because Alao's spoken English was "difficult to understand" but his written application included words such as "masterminded." A.R. 883–84. The Government candidly admitted that "sometimes it's difficult to understand you, your English." A.R. 883.

On December 22, 2010, the IJ issued an oral decision denying Alao's application for relief and ordering him removed. The IJ concluded, inter alia, that the persecutor bar applied in Alao's case because he helped destroy property belonging to members of Jos's Muslim population, which means that Alao is ineligible for asylum and withholding of removal. Alao appealed to the BIA, which dismissed his appeal. He filed a pro se motion to reopen in June 2011, which the BIA denied.

5

After his removal proceedings concluded in 2010, Alao's mental health deteriorated. His prison records from 2011 indicate that he became "increasingly erratic," A.R. 70, suffered from auditory and visual hallucinations, A.R. 74, and was "no longer coping," A.R. 71. Alao was later involuntarily admitted to a New York hospital for in-patient treatment from June to July 2016. His admission notes explained that he was unable to care for himself, required "psychiatric stabilization," and "present[ed] with psychomotor retardation." A.R. 81. Approximately two years later, Alao received additional in-patient treatment at a different hospital. He was ultimately diagnosed with schizophrenia in 2018 and given multiple antipsychotic medications and injections. Alao's medical records from both hospitals indicate that Alao could not remember or understand his diagnosis and was "unable to express [his] needs effectively." A.R. 108; see also A.R. 221 (explaining that Alao knew he had been admitted for psychiatric care but was "unsure when, where or why"); A.R. 234 (Alao has "[l]imited" insight and judgment).

Alao, through counsel this time, filed a second motion to reopen in April 2019. He argued that groups such as Boko Haram and the Islamic State West Africa began attacking Christians after he left Nigeria and that the conditions in Nigeria had worsened, thus increasing the risk of Alao being persecuted. The evidence Alao presented included, inter alia, reports and travel advisories from the U.S. Department of State, human rights reports, security alerts from the U.S. Embassy and Consulate in Nigeria, and news reports about bombings and attacks.

6

Alao also explained that his "psychotic episodes manifest visibly" and that he likely would not receive medical treatment because of the stigma surrounding people with mental illnesses in Nigeria. A.R. 30. He provided reports and studies concerning mental health services in Nigeria and the treatment of and attitude towards people with mental illnesses. According to Alao, this stigma would lead to the Nigerian Government acquiescing or turning a blind eye to his torture. Alao also asked that the BIA alternatively reopen his case under its sua sponte authority.

The BIA denied Alao's motion to reopen, holding that Alao had failed to show that conditions for Christians in Nigeria had worsened because the increased violence "would have occurred prior to [Alao's] hearing." Appendix ("App.") 4. The BIA did not discuss any of the evidence Alao presented and instead concluded that this increase in violence was a "continuation of the same violence between Christians and Muslims" that Alao feared during his removal proceedings. App. 4–5. It also concluded that Alao's evidence about his mental illnesses was "not new and previously unavailable." App. 5. Because the BIA concluded that Alao had not shown exceptional circumstances and that his due process rights were not violated, the BIA also denied his request that the BIA sua sponte reopen his proceedings. Alao timely filed a petition for review.

## II.[3]

There is no dispute that Alao's second motion to reopen is time-barred and number-barred. See 8 C.F.R. § 1003.2(c)(2). Alao was ordered removed in December

---

[3]    The BIA had jurisdiction under 8 C.F.R. § 1003.2. We have jurisdiction under 8 U.S.C. § 1252(a)(2)(D). We review the denial of a motion to reopen for an abuse of

7

2010.  He filed his first motion to reopen in 2011.  The time and numerical limitations, however, do not apply if Alao demonstrates "changed circumstances" in Nigeria through material evidence that "was not available and could not have been discovered or presented at the previous hearing."  See id. § 1003.2(c)(3)(ii).

We have previously explained at length the BIA's obligations when reviewing motions to reopen.  See, e.g., Liem v. Att'y Gen., 921 F.3d 388, 395–400 (3d Cir. 2019); Zhu v. Att'y Gen., 744 F.3d 268, 272, 277–79 (3d Cir. 2014); Zheng v. Att'y Gen., 549 F.3d 260, 268–69 (3d Cir. 2008).  The BIA must meaningfully consider the evidence and arguments the applicant presents.  Liem, 921 F.3d at 395.  Although the BIA does not need to "expressly parse each point or discuss each piece of evidence presented," it must "provide[] an indication that it considered such evidence, and if the evidence is rejected, an explanation as to why it was rejected."  Id. (quoting Zhu, 744 F.3d at 278).  In other words, the BIA has a duty to consider explicitly an applicant's country conditions evidence — a duty that is even "greater" if the motion to reopen is based on changed country conditions.  See Zheng, 549 F.3d at 268 (quoting Guo v. Gonzales, 463 F.3d 109, 115 (2d Cir. 2006)).  The BIA fails to fulfill this duty if its decision relies on conclusory statements and fails to discuss "most of the evidence submitted" and "why that evidence was insufficient to show materially changed country conditions."  Liem, 921 F.3d at 396.

The BIA has failed to meet these basic requirements in this case.  Alao submitted twelve articles and reports that arguably showed a marked increase in violence against

discretion and will not disturb the BIA's decision unless it is arbitrary, irrational, or contrary to law.  Liem v. Att'y Gen., 921 F.3d 388, 395 (3d Cir. 2019).

8

Christians in Nigeria. The BIA was required to "meaningfully consider" this evidence when it reviewed Alao's second motion to reopen. See id. at 395 (alteration and citation omitted). Yet the BIA dismissed this evidence as "appear[ing] to be a continuation of the same violence between Christians and Muslims" without citing to a single exhibit or explaining the reasoning behind its conclusory statement. App. 4–5. "By failing to address these exhibits — let alone merely acknowledge them — the BIA contravened our mandate that it show that it considered the entire evidentiary record." Liem, 921 F.3d at 400.

The BIA similarly failed to show that it considered the entire evidentiary record when it evaluated Alao's argument that he would be persecuted or tortured because of his mental illnesses. Alao presented evidence of his own mental illnesses and submitted several documents concerning the treatment of people with mental illnesses in Nigeria. The BIA not only failed to address any of these documents, but also rejected Alao's argument because the evidence of his own mental illnesses was "not new and previously unavailable," App. 5, even though 8 C.F.R. § 1003.2(c)(3)(ii) provides a different standard under which the BIA must consider whether the evidence of changed country conditions "is material and was not available and could not have been discovered or presented at the previous hearing." The BIA's cursory statement that Alao "has not specifically cited to any evidence proffered with the motion that reflects a specific intent to torture those with mental illness in Nigeria" is not sufficient to show that it considered the entire evidentiary record, especially given the BIA's failure to cite to even one of Alao's exhibits. App. 5. The BIA has thus "failed to 'announce its decision in terms

9

sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.'" Zhu, 744 F.3d at 278 (quoting Ni v. Holder, 715 F.3d 620, 631 (7th Cir. 2013)). We express no opinion on the merits of Alao's arguments but note that we remand only with respect to Alao's CAT claim because of the persecutor bar. See Negusie v. Holder, 555 U.S. 511, 514 (2009).

Alao also asked that the BIA reopen his proceedings under its sua sponte authority because of several due process violations concerning his mental competence, the IJ's repeated assertions that he did not need an attorney, and the language difficulties he had throughout his removal proceedings. Although we are concerned about these allegations based on our review of the record, we do not reach this issue because the BIA's failure to meaningfully consider Alao's changed country conditions evidence and arguments requires that we vacate the BIA's order and remand so that the BIA can fulfill its duties. Without intending to suggest how the issue should be decided, we encourage the BIA, on remand, to consider whether these alleged obstacles to a fair hearing give rise to an "exceptional situation[]" that would justify reopening Alao's case under 8 C.F.R. § 1003.2(a). Park v. Att'y Gen., 846 F.3d 645, 650 (3d Cir. 2017).

## IV.

For the foregoing reasons, we will grant the petition for review, vacate the order denying the motion to reopen, and remand the case to the BIA for further proceedings consistent with this opinion.