**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2207
_____

FEI YAN ZHU,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A077-023-608)
Immigration Judge:  Honorable Henry S. Dogin
_____

Argued January 7, 2014

Before:  SMITH, SHWARTZ, and SCIRICA, <u>Circuit Judges</u>.

(Opinion Filed: March 4, 2014)

Theodore N. Cox, Esq. [ARGUED]
325 Broadway

Suite 201
New York, NY 10007

Counsel for Petitioner

Eric H. Holder, Jr., Esq.
Stuart F. Delery, Esq.
Thomas W. Hussey, Esq.
Blair O'Connor, Esq.
Glen T. Jaeger, Esq.
Rachel L. Browning, Esq. [ARGUED]
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Counsel for Respondent

_____

OPINION

_____

SHWARTZ, Circuit Judge.

Fei Yan Zhu, a native and citizen of the People's Republic of China, petitions for review of an order of the Board of Immigration Appeals ("BIA") denying her motion to reopen her removal proceedings pursuant to 8 C.F.R. § 1003.2. Because the BIA's opinion did not reflect meaningful consideration of much of the evidence that Zhu submitted in support of her motion, we will grant the petition

for review, vacate the order denying the motion to reopen, and remand to the BIA for further proceedings.[1]

## I.

Zhu is from Changmen Village, Guantou Town, Lianjiang County, Fujian Province, China. She entered the United States in 1999 without proper documentation. During her interview with the Immigration and Naturalization Service ("INS"), she stated that she feared persecution because of her opposition to China's population control policies. The INS determined that she met the credible fear standard, and she was paroled into the United States for a hearing before an immigration judge ("IJ") to determine her eligibility for asylum.

On February 15, 2000, Zhu appeared before the IJ, conceded her removability, and filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), based on a claim that she had been and/or would be persecuted for having resisted population control measures. At the hearing, Zhu testified that she had a heated exchange with birth control officials and that they tried to force her to wear an intrauterine device

---

[1] We note at the outset that the record in the instant case is very similar to that considered by the Court of Appeals for the Seventh Circuit in Ni v. Holder, 715 F.3d 620 (7th Cir. 2013), and the BIA appears to have used almost identical language in its decisions in both cases. The Seventh Circuit found "the BIA failed meaningfully to address documents bolstering [the] assertion that conditions in China have changed for the worse." Id. at 622.

when they learned she and her boyfriend were living together. The IJ found Zhu's testimony lacked credibility, denied her application, and ordered her removed to China. The BIA affirmed the IJ's decision without an opinion.

In 2002, Zhu filed a timely motion to reopen, alleging that since the time of the IJ's decision she had married and given birth to a son, and that she would be forcibly sterilized if she returned to China. The BIA denied the motion, noting that Zhu only had one child, which was not in violation of Chinese population control policies, and that she had not shown that "a Chinese national becomes automatically subject to punitive birth control measures if she has returned with a child or children born outside China." Appendix ("App.")[2] 1213.

In 2008, Zhu filed a second motion to reopen, alleging that she had given birth to two more children and that conditions had changed in China because the Chinese government now counted children born overseas when considering violations of its population control policies. She submitted, among other things, a notice from the Family Planning Office of Lianjiang County to Zhu's parents, indicating that Zhu must submit to sterilization upon her return to China, and a letter from her mother, noting that the officials had learned that Zhu had children. The BIA denied the motion because Zhu's documentation showed no material change in country conditions, but rather reflected "incremental increases in the enforcement of family planning policies in China that have been in existence for approximately 30 years." App. 1146.

---

[2] All cites to the appendix are to volumes II and III.

4

On January 14, 2013, Zhu filed a third motion to reopen, this time with voluminous documentation that she asserts demonstrates a "material change" in China's enforcement of its population control policies in her home region. See App. 11-1143. These documents purportedly come from the U.S. government, Chinese government websites, Chinese governmental entities or officials, and international media outlets. She contends that these documents show that the United States Department of State's May 2007 "China: Profile of Asylum Claims and Country Conditions" (the "2007 Profile"), which the BIA had previously relied upon concerning treatment of those who violate the population control policies, does not reflect current conditions in China. Among other things, Zhu asserts that these documents show that foreign-born children now count for family planning purposes and new programs have been implemented in her home province that more strictly enforce population controls. Zhu also provided an affidavit from an expert opining about the authenticity of four documents purporting to embody population control enforcement measures from Changle City, which is approximately thirty kilometers from Zhu's hometown of Guantou. On March 28, 2013, the BIA denied Zhu's motion to reopen, concluding that she had failed to establish a material change in country conditions and had not demonstrated a prima facie case for CAT relief. Zhu thereafter filed a petition for review.

## II.

The BIA had jurisdiction under 8 C.F.R. § 1003.2 to review Zhu's motion to reopen, and we have jurisdiction to review the BIA's decision pursuant to 8 U.S.C. § 1252(a)(1). We review the denial of a motion to reopen for an abuse of

5

discretion. Guo v. Ashcroft, 386 F.3d 556, 562 (3d Cir. 2004) Thus, the BIA's ultimate decision is entitled to "broad deference," Ezeagwuna v. Ashcroft, 325 F.3d 396, 409 (3d Cir. 2003) (internal quotation marks omitted), and "will not be disturbed unless [it is] found to be arbitrary, irrational, or contrary to law." Guo, 386 F.3d at 562 (internal quotation marks and citation omitted).[3] Similarly, we review the BIA's evidentiary rulings deferentially. See Cheng v. Att'y Gen., 623 F.3d 175, 182 (3d Cir. 2010).

## III.

With limited exceptions, a motion to reopen must be filed within ninety days of the date of entry of a final administrative order. 8 C.F.R. § 1003.2(c)(2). To obtain relief based on an untimely motion to reopen, Zhu had to provide material evidence of changed conditions in China that could not have been discovered or presented during the previous proceeding. See 8 C.F.R. § 1003.2(c)(3)(ii). Here, the BIA denied Zhu's motion to reopen her removal proceedings because it found: (1) "[h]er evidence is not sufficient to establish a material change in circumstances or country conditions 'arising in the country of nationality' so as to create an exception to the time and number limitations for filing another late motion to reopen to apply for asylum," and

---

[3] We review the BIA's factual findings under the substantial evidence standard, which means that they are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B); Abdille v. Ashcroft, 242 F.3d 477, 483–84 (3d Cir. 2001).

6

(2) she "has not demonstrated a prima facie case for protection under [CAT]."[4] App. 6.

To determine if the BIA abused its discretion in finding that Zhu did not present evidence to establish a material change in country conditions, we must determine if the BIA meaningfully considered the evidence and arguments Zhu presented. Zheng v. Att'y Gen., 549 F.3d 260, 266 (3d Cir. 2008). This does not mean that the BIA is required to expressly parse each point or discuss each piece of evidence presented, id. at 268, but "it may not ignore evidence favorable to the alien." Huang v. Att'y Gen., 620 F.3d 372, 388 (3d. Cir. 2010). To fulfill this requirement, the BIA must provide an indication that it considered such evidence, and if the evidence is rejected, an explanation as to why it was rejected.

In this case, Zhu presented more than 85 documents, spanning over 1,000 pages. With little explanation, the BIA concluded that: (1) Zhu failed to authenticate documents from China; (2) documents from places other than Zhu's hometown or county do not establish she is likely to be persecuted; (3) her expert's opinion concerning the authenticity of four foreign documents was speculative; (4) evidence from components of the United States government did not show Zhu would be subjected to sterilization; and (5) she did not show that the 2007 Profile is now inaccurate or unreliable. We will examine the BIA's treatment of each category of evidence.

---

[4] On appeal, Zhu does not challenge the BIA's finding that she did not show prima facie eligibility for CAT relief.

7

## A. Foreign Government Documents

### 1. Authentication Generally

We first address the authentication of documents from foreign sources. Pursuant to 8 C.F.R. § 1287.6,[5] official foreign records must be "evidenced by an official publication" or "certified by an officer in the Foreign Service of the United States, stationed in the foreign country where the record is kept." Attempting to comply with this provision, Zhu's attorney sent each Chinese government document to the Consulate General of the United States in Guangzhou, China, and the Fujian Provincial Foreign Affairs Office, asking for assistance in authenticating the documents, but he received no replies.

Although failure to authenticate pursuant to 8 C.F.R. § 1287.6 does not result in automatic exclusion, Liu v. Ashcroft, 372 F.3d 529, 532 (3d Cir. 2004), an unsuccessful effort to obtain such a certification does not excuse the proponent of the document from providing other grounds on which the BIA could find that a document is what it purports to be. Indeed, we have held that when an asylum seeker fails to comply with the certification procedure set forth in 8 C.F.R. § 1287.6 because of a "lack of cooperation from government officials in the country of alleged persecution," that individual may "attempt to prove the authenticity . . .

---

[5] The language of this regulation is identical to 8 C.F.R. § 287.6. The only meaningful distinction is that 8 C.F.R. § 287.6 applies to proceedings before an IJ, whereas 8 C.F.R. § 1287.6 applies to proceedings before the BIA.

through other means."[6]  Lin v. Att'y Gen., 700 F.3d 683, 686-87 (3d Cir. 2012) (citing Liu, 372 F.3d at 533).  Proponents of evidence have an obligation to lay a foundation from which a factfinder can conclude the evidence is what it purports to be and that it is trustworthy.  The BIA concluded that Zhu had not "established the authenticity of her foreign documents in another manner."  App. 5.   Other than its analysis of the expert's opinion concerning a handful of local documents, the decision treats most of the foreign documents Zhu submitted similarly, regardless of their alleged source, and does not address whether other efforts were made to authenticate the documents and, if so, why they failed.[7]

Although the Federal Rules of Evidence do not apply to immigration proceedings, Ezeagwuna, 325 F.3d at 405, evidence is admissible if it is probative and its use is fundamentally fair so as not to deprive the alien of due process.  See, e.g., Lin v. U.S. Dep't of Justice, 459 F.3d 255, 268 (2d Cir. 2006).  Exclusion of evidence is exceptional.  INS v. Lopez-Mendoza, 468 U.S. 1032, 1050 (1984).  Nonetheless, the BIA can reject evidence that it finds to be untrustworthy or irrelevant and can accept evidence that has significant indicia of reliability.

---

[6] We have adopted this holding because "asylum applicants [cannot] always reasonably be expected to have an authenticated document from an alleged persecutor."  Liu, 372 F.3d at 532.

[7]The BIA did consider Zhu's proffered expert opinion as to the authenticity of four local government documents.  But other than the expert opinion, the BIA's opinion does not reflect consideration of other means by which Zhu's foreign documents may be authenticated.

9

These significant indicia of reliability may be shown in various ways. For example, proponents could turn to the Federal Rules of Evidence, even though they are not binding, for guidance. Here, some of the documents Zhu presented appear to come from Chinese government websites (indicated by ".gov.cn" domain names). App. 307-33. The Court of Appeals for the Seventh Circuit, considering the same documents and relying on Fed. R. Evid. 902, held that documents from Chinese government websites are "presumptively authentic if government sponsorship can be verified by visiting the website itself." Chen v. Holder, 715 F.3d 207, 212 (7th Cir. 2013). This is one example of how the Federal Rules of Evidence may provide an avenue to authenticate documents.[8]

In addition, proponents may provide other grounds upon which the BIA could find the documents authentic. For instance, the proponent could provide information concerning how the document was obtained, identify the source of the information contained in the document, or show that there are

---

[8] The BIA itself has recognized that "[t]he [Rules], while not binding, may provide helpful guidance in immigration proceedings because the fact that specific evidence would be admissible under the Federal Rules 'lends strong support to the conclusion that admission of the evidence comports with due process.'" Matter of D-R-, 25 I. & N. Dec. 445, 458 n.9 (BIA 2011) (quoting Felzcerek v. INS, 75 F.3d 112, 116 (2d Cir. 1996)); see also Vatyan v. Mukasey, 508 F.3d 1179, 1182-84 (9th Cir. 2007) (holding that foreign government records may be authenticated through 8 C.F.R. § 1287.6 or any recognized procedure, including the Federal Rules of Evidence).

consistencies between the information contained in the otherwise unauthenticated document and authenticated documents. A proponent could also offer an expert to testify about these topics and others, such as the use of government seals or the presence of official signatures with which the expert is familiar. The proponent could also offer forensic testing results or evidence from the United States Department of State concerning foreign documents. Cf. Liu, 372 F.3d at 534-35 & n.9 (reminding the BIA that it may "choose to order forensic testing of the original [document] . . ., take additional testimony, [and] seek guidance from State Department reports"). We emphasize that the burden to make this showing of authenticity as well as relevance rests with the proponent of the document. The BIA is not required to conduct an independent examination of a document where the proponent has provided no basis from which it could find the document is authentic or decipher its relevance. Thus, if a proponent fails to make such a showing, then it is within the BIA's discretion to decline to rely on such evidence. If such a showing is made, then the BIA must consider the evidence. See Zheng, 549 F.3d at 266.

### 2. Documents from Guantou Town and Lianjiang County

Turning to Zhu's evidence, we will first examine the BIA's treatment of documents from Zhu's hometown and county, which the BIA either ignored, rejected, or discounted. These documents purport to describe recent population campaigns to meet quotas for sterilizations and abortions.[9]

---

[9] For example, Zhu submitted the following evidence that was unavailable at the time of her last motion to reopen:

11

The Court of Appeals for the Seventh Circuit reviewed many of the same documents and noted that if the documents are genuine, "they constitute strong evidence that harrowing practices are common in" her hometown and county. <u>Ni</u>, 715 F.3d at 628. The BIA did not specifically discuss these

a post-September 1, 2008 document purportedly issued by the People's Government of Guantou Town as family planning publicity material, titled "The Campaign of 'Bringing the New Custom of Marriage and Child-bearing into Thousands of Households' in Guantou Town," which states that "[w]omen with one child are required to perform an IUD insertion; women with two or more children are required to perform the sterilization . . . [r]emedial measures should be taken for unauthorized pregnancies (such as abortion or induced labor abortion)," App. 729-30; a June 11, 2009 document allegedly issued by the People's Government of Guantou Town to every village, titled "Notification with regard to the Issues on Stepping Up the Work of the Hundred-Day Battle on Population and Family Planning," which instructs officials to "complete the missions of required abortion, induced labor abortion, sterilization, and collection of social maintenance fees," App. 701; and a December 24, 2010 document supposedly issued by the Lian Jiang County Population and Family Planning Leadership Group to various township family planning leadership groups, titled "Announcement on Launching Countywide Massive Family Planning Clean-Up Work," which instructs them to form "task force[s]" to "enter into the homes" of people who "return to their hometown for the holidays" and conduct a "2011 New Year and Spring Festival massive cleanup campaign on 'double check-ups,' 'four surgeries' and social child support fee collections," App. 687.

documents, so we do not know if it discounted them because they lacked authenticity or relevance, or for some other reason. Thus, we are unable to evaluate whether the BIA appropriately exercised its discretion.

Because the documents from Zhu's hometown and county that she presented, if authentic, may be probative and other avenues may be available to authenticate them, and because we are unable to discern why the BIA discounted them, we will remand to the BIA for it to consider whether Zhu has made a showing of authenticity and relevance concerning those documents. If the BIA determines that such a showing has been made, then it may give whatever weight it deems appropriate to that evidence in light of all of the other evidence presented. Liu, 372 F.3d at 534 n.9 ("[T]he BIA may proceed on remand as it does with respect to any evidentiary question, evaluating issues of materiality, relevance, probity, and the general requirements of due process.").

### 3. Documents from Fujian Province

We next examine the documents from neighboring areas within Zhu's home province, Fujian. Zhu offered documents that appear to come from Fujian's government website and other province level sources,[10] as well as internal

---

[10] For example, Zhu submitted a print-out purportedly from a Fujian government website page dated May 6, 2008, titled "Answer to Robert Lin's Inquiry: 'Family Planning Policy with Respect to People Returning to China from Overseas,'" which gives an answer from Fujian's Population and Procreation Planning Committee, stating that the

government documents from other towns and counties within Fujian,[11] that purport to describe population control campaign

---

sterilization policy applies to parents of two overseas-born children returning to Fujian. App. 307-08.

[11] For example, Zhu submitted the following evidence that was unavailable at the time of her last motion to reopen: a May 7, 2009 document allegedly issued by the Chang Le City Population and Family Planning Leadership Group, titled "Announcement on Diligently Implementing the Population and Family Planning Work in May, June and July," which instructs officials to "[s]upervise the actualization of double check-ups, IUD installation, sterilization and social child support fee collections" and [s]peed up the sterilization process," while explaining that "[a]ll illegal extra pregnancies should be inducted or terminated." App. 401-03; a December 2, 2009 document purportedly issued by the Family Planning Leading Group of Tantou Town, titled "Notice of Strengthening of Family Planning Work of Tantou Town," which, in accordance with "the spirit of 'Population and Family Planning Regulations of Fujian Province,'" confirms that "Chinese women whom have given birth to two children in a foreign country . . . [r]egardless of whether their children have foreign nationality . . . are required to return to China and undergo sterilization operation . . . [u]nless they change their nationalities," App. 608; and a December 31, 2009 document supposedly issued by the Leading Team of Population and Family Planning of Chang Le City, titled "Notification with Regard to Serious Implementation of Population and Family Planning Program in October, November and December," which instructs the leading teams of various townships to "organize village household cadres to prepare for an urgency effort on targets

14

details and policies. The BIA found documents outside Zhu's hometown and county inapplicable to Zhu, and hence irrelevant. The BIA's treatment of this evidence is inconsistent with its past decisions wherein it allowed a petitioner to establish eligibility for relief based upon evidence that the births of her children "violated family planning policies in that alien's local province, municipality, or other locally-defined area." In re J-H-S-, 24 I. & N. Dec. 196, 197-98 (BIA 2007); cf. Shao v. Mukasey, 546 F.3d 138, 142 (2d Cir. 2008) (noting the BIA acknowledges the local nature of family planning enforcement in China). Moreover, the BIA inexplicably found the information in these documents to be of no value yet found information in U.S. country reports describing activities in areas outside of Zhu's home region, as described below, worthy of consideration. Because the BIA did not explain why it did not consider Zhu's evidence from other areas within her home province of Fujian—some of which are within 30 kilometers of her hometown—and which may corroborate her claim, we will remand for the BIA to consider whether the documents from Zhu's province are authentic and relevant, and, if they are, why they do not warrant reopening the proceedings.[12]

---

who have failed to carry out long-term contraceptive measures," "strictly fulfill any proposed sterilization duty," and "[s]trengthen critical remedial measures" by "implementation of induced labor operation." App. 852.

[12] This directive is not tantamount to requiring that the BIA grant the motion to reopen. Rather, it is a directive to explain if the proponent has shown that the documents are relevant and authentic and, if so, whether they support the motion to reopen.

We will, however, not disturb the decision to reject the expert opinion that Zhu offered to authenticate four documents purportedly from the Chang Le City Population and Family Planning Leadership Group, Chinese Communist Party Chang Le City Shou Zhan Township Committee, and the Shou Zhan Township Population and Family Planning Leadership Group. Zhu's expert, Dr. Flora Sapio,[13] opined that the documents were authentic based on their language, style, format, and internal coherence. She identified two of the documents as notices, and concluded, based on their bureaucratic language and the persons to whom they are addressed, that one is from an organ of the state and one is from the party committee of Shouzhan Township in Fujian Province. She then explained that the other two documents are likely internal memoranda that administrative law enforcement officials used or possibly distributed to residents, given their simple language and terse tone. The BIA discounted Dr. Sapio's expert opinion because it found it "speculates as to the credibility of the authors and the circumstances under which the documents were created." App. 6.

As stated earlier, we review the BIA's evidentiary ruling deferentially. Cheng, 623 F.3d at 182. Under this

---

[13] Dr. Sapio received her doctorate in History and Civilization of the Far East, and describes herself as a Chinese law scholar. She has published articles about corruption and economic crimes in China. She explained that, as part of her research on "legal lawlessness," App. 468, she examines Chinese legal and political documents, and the first operation she normally performs on any document source is assessing whether or not it is genuine.

16

deferential standard, we cannot say that the BIA abused its discretion in discounting the expert's opinion. Other than saying that she received the documents from Zhu's counsel, Dr. Sapio does not provide any information concerning how or from whom the documents were obtained. Moreover, while Dr. Sapio explained why the presence or absence of serial numbers, the paper size, headings, interlinear spaces, margins, main body of text, official seals, filing information, and classification level suggest that they are authentic documents from government entities, she provided no statements that show she is familiar with official seals or serial numbers used by the purported sources of these documents such that a factfinder could determine that the document comes from the entity associated with the seal. Thus, the BIA had no information upon which to determine the source of these four documents other than the linguistic analysis on which Dr. Sapio asked the BIA to rely. Unlike other evidence it inexplicably discounted, the BIA explained why it rejected reliance on the expert's opinion. This explanation showed that the BIA considered the documents and the opinion and found that it lacked a basis on which to conclude that the documents came from the entities listed on them. For these reasons, we will not disturb the BIA's decision not to rely upon Dr. Sapio's expert opinion.[14]

## B. U.S. Government Documents

---

[14] As the Seventh Circuit noted, the BIA's rejection of Dr. Sapio's expert opinion has been discussed in at least nineteen appellate cases from six circuits, and not once has a court of appeals found the BIA's rejection of the expert report to constitute an abuse of discretion. See Ni, 715 F.3d at 625.

17

Finally, we examine the BIA's treatment of documents from components of the U.S. government. In this case, there is no indication that the BIA misunderstood its authority to consider such documents, but it appears it did not give full consideration to their contents. The BIA found that the 2009 and 2010 Annual Reports of the Congressional-Executive Commission on China ("CECC"),[15] the 2007 Profile, and State Department reports from 1994, 1995, 1998, 2004, and 2005[16] indicated that "social compensation fees, job loss or demotion, loss of promotion opportunity, expulsion from the party, destruction of property, and other administrative punishments are used to enforce [China's] family planning policy." App. 5. The BIA then concluded that this evidence "is not sufficient to demonstrate that the respondent will be

---

[15] The CECC is a body created by Congress with the legislative mandate to monitor human rights and the development of the rule of law in China. It is composed of nine Senators, nine Members of the House of Representatives, and five senior Administration officials appointed by the President. See http://www.cecc.gov/about. The CECC reports "are pertinent official publications of the federal government." Chen, 715 F.3d at 209.

[16] These other State Department reports are titled: "China – Country Conditions and Comments on Asylum Application," dated December 20, 1994, App. 1125-44; "China – Country Conditions and Comments on Asylum Application," dated December 11, 1995, App. 1051-74; "China: Profile of Asylum Claims and Country Conditions," dated April 14, 1998, App. 1076-89; "China: Profile of Asylum Claims and Country Conditions," dated June 2004, App. 1091-99; and "China: Profile of Asylum Claims and Country Conditions," dated October 2005, App. 1101-10.

18

subjected to sterilization." Id.[17]  While the BIA recited a number of social and economic actions that China takes to enforce its population control policies, it seemingly ignored statements in the 2009 and 2010 CECC Reports concerning "forced abortions" and "coerced abortions and sterilizations."[18]  App. 111, 140, 142-43.  Like our sister circuit, who criticized an identical BIA conclusion[19] about enforcement methods, we too question "[w]hy the BIA found the [CECC] Reports' discussion of certain 'administrative punishments' and coercive tactics to be persuasive, but

---

[17]The BIA also held that Zhu had failed to show that she would face economic harm amounting to persecution because she had not offered information to establish her current financial situation.  App. 6 (citing to In re T-Z-, 24 I. & N. Dec. 163 (BIA 2007) (no showing of economic sanctions amounting to persecution where the record contains scant information concerning the applicant's financial situation)).  On appeal, Zhu does reference the fines she would face if forced to return to China, but she does not challenge the BIA's ruling that failure to provide evidence of her financial situation dooms that argument.

[18]Also curious is the BIA's reliance on evidence of the enforcement methods described in the documents from 1994 to 2004, particularly where the BIA is only allowed to grant a motion to reopen if presented with new or previously unavailable evidence.  8 C.F.R. § 1003.2(c)(3)(ii).

[19] The BIA in Ni also ignored the portions of the CECC reports that described abortion and sterilization activities and used language identical to the language the BIA used in Zhu's case in reaching its conclusions about what could be drawn from these documents.  Compare Ni, 715 F.3d at 627 with App. 5.

19

[apparently] found the Reports' discussion of forced sterilizations and abortions in Fujian Province not to be persuasive . . . ." Ni, 715 F.3d at 627. Moreover, the BIA's treatment of these reports is inconsistent with its precedent that requires a comparison of current country conditions with those that existed at the time of the hearing on the merits of the petition before the IJ. See In re S-Y-G, 24 I. & N. Dec. 247, 253 (BIA 2007). Because these reports materially bear on Zhu's claim and it appears that the BIA only considered parts of them, and in light of the BIA's duty to consider material evidence and explain why it does or does not support the position of a party,[20] Zheng, 549 F.3d at 268, we will remand to the BIA for its full consideration of these reports.[21]

---

[20] We do note that, despite Zhu's arguments to the contrary, the BIA did not err in continuing to place great weight on the 2007 Profile. See Ambartsoumian v. Ashcroft, 388 F.3d 85, 89 (3d Cir. 2004) (holding that "State Department reports may constitute 'substantial evidence' for the purposes of reviewing immigration decisions"); Lal v. INS, 255 F.3d 998, 1023 (9th Cir. 2001) (describing State Department country reports as the "most appropriate and perhaps best resource" on country conditions (internal quotation marks omitted)). The BIA explained that the evidence Zhu presented did not "support [Zhu's] claim that the 2007 Profile is heavily reliant upon information provided by the Chinese government," because it found that "State Department reports . . . cite multiple sources of information." App. 5. That said, on remand, the BIA should provide an explanation for rejecting Zhu's assertion that more recent CECC reports show an increase in the use of "coercive measures" to enforce the population control policies and thus, from her perspective, suggest that the 2007 Profile is out-of-

In short, like the Seventh Circuit, we conclude that the BIA's treatment of the U.S. Government and foreign government evidence was "perfunctory," Ni, 715 F.3d at 627, and, as a result, the BIA failed to "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Id. at 631 (internal quotation marks and citation omitted); see also Chen v. Holder, --- F.3d ---, No. 12-2279, 2014 WL 448444, at *7 (4th Cir. Feb. 5, 2014) (remanding because the IJ and BIA failed to reconcile or explain why the 2009 CECC Report is "less persuasive" than the 2007 Profile); Zheng, 549 F.3d at 266 (holding that "the BIA must actually consider the evidence and argument that a party presents" (internal quotation marks and citation omitted)); Guo v. Gonzales, 463 F.3d 109, 115 (2d Cir. 2006) (holding that the BIA has "a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim," and a "similar, if not greater, duty arises in the context of motions to reopen based on changed country conditions" (internal quotation marks and citations omitted)); Yang v. Gonzales, 427 F.3d 1117, 1122 (8th Cir. 2005) ("If an agency makes a finding of fact without mentioning or analyzing significant evidence, its decision should be reconsidered." (internal quotation marks and citation omitted)).

---

date. If the BIA is providing greater weight to State Department reports over reports from other United States government entities, then it should explain why it is doing so.

[21] This is not to suggest that the CECC reports alone are necessarily sufficient to demonstrate a material change in country conditions. Ni, 715 F.3d at 627.

21

## IV.

Because the BIA did not meaningfully address many of the documents Zhu presented, we will remand to the BIA for a more thorough review and explanation as to whether Zhu's evidence is authentic and, if so, whether it establishes a material change in country conditions. We are not suggesting that the evidence is authentic or sufficient. Rather, we will remand for the BIA to meaningfully review the evidence, which may yield a different result or a further explanation for the BIA's decision.[22]

For all of these reasons, we will grant the petition for review, vacate the order denying the motion to reopen, and remand the case to the BIA for further proceedings consistent with this opinion.

---

[22] As a result, we will not address the BIA's conclusion that the evidence was insufficient to establish a material change in country conditions.