NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2959
_____

GUANG LIN,

Petitioner

v.

ATTORNEY GENERAL
UNITED STATES OF AMERICA,

Respondent

_____

On Petition for Review of a Decision
and Order of the Board of Immigration Appeals
(BIA-1 : A098-694-619)
Immigration Judge: Charles M. Honeyman

_____

Argued on June 12, 2019

BEFORE:  HARDIMAN, PORTER, and COWEN, <u>Circuit</u> <u>Judges</u>

(Filed: August 23, 2019)
_____

Theodore N. Cox (argued)
Law Office of Theodore N. Cox
325 Broadway
Suite 201
New York, NY 10007

  Attorney for Petitioner

Gregory A. Pennington, Jr.

United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

Robert D. Tennyson, Jr. (argued)
United States Department of Justice
Office of Immigration Litigation
Room 2043
450 5ᵗʰ Street, N.W.
P.O. Box 878
Washington, DC 20001

<u>Attorneys for Respondent</u>

_____

OPINION[*]
_____

COWEN, <u>Circuit</u> <u>Judge</u>.

Guang Lin petitions for review of a decision and order by the Board of

Immigration Appeals ("BIA") denying her motion to reopen. Because the BIA failed to

meaningfully consider the evidence presented by Lin, we will grant her petition for

review, vacate the BIA's order, and remand for further proceedings.

I.

Lin and her husband, Mou Zeng Chen, are natives and citizens of the People's

Republic of China. Lin entered the United States without being admitted or paroled, and

Chen entered without valid entry documents. Conceding removability, Lin filed an

application for asylum, withholding of removal, and relief under the Convention Against

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

Torture ("CAT"), with Chen as a rider on her application. At her June 13, 2008 hearing, Lin testified that, since her arrival, she had given birth to three United States citizen children and that she feared she would be forcibly sterilized for violating China's family planning policies if returned. At the conclusion of the hearing, the Immigration Judge ("IJ") denied her application for relief. Dismissing Lin's administrative appeal on November 13, 2009, the BIA agreed with the IJ that Lin failed to establish that her fear of coercive sterilization was objectively reasonable. On November 4, 2010, this Court denied the petition for review, concluding that "Petitioners have not shown that the record compels a finding that Lin has an objectively reasonable fear of future persecution." Lin v. Att'y Gen., 400 F. App'x 656, 658 (3d Cir. 2010).

In 2018, Lin filed a motion to reopen with the BIA. She argued that "[n]ew and previously unavailable evidence demonstrates the heightened enforcement of the family planning policy in Respondent's home locale, Lianjiang County, Fujian Province, and the *clear likelihood* that coercion will be used against Ms. Lin if she is removed to China." (AR37.) The BIA denied her motion on the grounds that Lin "has not demonstrated materially changed country conditions in China since her proceedings in 2008 to warrant an exception to the time limit for her motion to reopen, and she has not established her prima facie eligibility for the relief she seeks upon reopening." (AR4 (citing Pilumi v. Att'y Gen., 642 F.3d 155, 161 (3d Cir. 2011); In re S-Y-G-, 24 I. & N. Dec. 247, 247 (BIA 2007)).)

II.

3

"[T]he BIA has 'a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim.' This duty is heightened for motions to reopen based on changed country conditions." Liem v. Att'y Gen., 921 F.3d 388, 395 (3d Cir. 2019) (quoting Zheng v. Att'y Gen., 549 F.3d 260, 268 (3d Cir. 2008)). While it need not discuss every piece of evidence presented, the BIA may not ignore evidence favorable to the petitioner. See, e.g., id. at 395; Zhu v. Att'y Gen., 744 F.3d 268, 278 (3d Cir. 2014). "'To [show that it] fulfill[ed] this requirement, the BIA must [have] provide[d] an indication that it considered such evidence, and if the evidence is rejected, an explanation as to why it was rejected.'" Liem, 921 F.3d at 395 (quoting Zhu, 744 F.3d at 278).

We "must determine if the BIA meaningfully considered the evidence and arguments [Lin] presented."[1] Zhu, 744 F.3d at 278 (citing Zheng, 549 F.3d at 266). We determine that the BIA did not satisfy its duty of meaningful consideration. Lin's voluminous evidence can be broken down into three basic categories: (1) various documents dating from 2009 and 2010 from Lin's home county (Lianjiang County) and other localities in her home province (Fujian Province) purportedly describing what she called in her motion "new campaigns to enforce predetermined targets for family planning procedures" (AR45 (addressing Exhibits D-E, G-R (AR144-AR171, AR179-AR330))); (2) selected pages from the 2010-2017 reports by the Congressional-Executive

---

[1] We have subject matter jurisdiction pursuant to 8 U.S.C. § 1252. We review the denial of a motion to reopen for an abuse of discretion, which occurs if (inter alia) the BIA fails to meaningfully consider the evidence and arguments presented in support of the motion. See, e.g., Zhu, 744 F.3d at 271-72.

Commission on China ("CECC") (Exhibits B, V, X-BB, DD (AR107-AR129, AR363-AR391, AR397-AR482, AR492-AR514)), 2012 and 2016 reports from the Immigration and Refugee Board of Canada ("IRB") (Exhibits U, KK (AR350-AR362, AR532-AR535)), and excerpts from the 2015 State Department country report (as well as two State Department responses to requests under the Freedom of Information Act and the 2008 country report) (Exhibits S-T, CC (AR331-AR349. AR483-AR491)); and (3) various media reports and statements by human rights organizations regarding China's family planning policies and practices (Exhibits C, W, EE-JJ (AR130-AR143, AR392-AR396, AR515-AR531)).  In Zhu, we concluded that the BIA did not meaningfully consider many of the same documents, including documents from Zhu's (and Lin's) home county and other towns and counties within their home province purportedly describing population campaigns to meet sterilization and abortion quotas as well as the 2010 CECC report addressing coerced abortions and sterilization, 744 F.3d at 270-79.  Reaching the same conclusion here, "we will remand for the BIA to meaningfully review the evidence," id. at 279 (footnote omitted).

After summarizing Lin's arguments and identifying the documents submitted in support of her motion to reopen, the BIA determined that the evidence (specifically the CECC and State Department reports) reflects that social compensation fees, loss of job, promotion, and educational opportunities, expulsion from the party, destruction of property, and other administrative measures have long been used to enforce family planning policies.  Missing from the BIA's enumeration was any reference to the incidents of coerced or forced sterilization and abortion (including in Fujian Province)

5

described in the CECC, State Department, and IRB documents as well as the media reports and statements by human rights organizations. In Zhu, the BIA similarly "found that the 2009 and 2010 [CECC reports], the 2007 Profile, and State Department reports from 1994, 1995, 1998, 2004, and 2005 indicated that 'social compensation fees, job loss or demotion, loss of promotion opportunity, expulsion from the party, destruction of property, and other administrative punishments are used to enforce [China's] family planning policy.'" Zhu, 744 F.3d at 277 (footnote omitted) (citation omitted). "The BIA then concluded that this evidence 'is not sufficient to demonstrate that the respondent will be subjected to sterilization.'" Id. (citation omitted). We determined that this explanation was insufficient:

> While the BIA recited a number of social and economic actions that China takes to enforce its population control policies, it seemingly ignored statements in the 2009 and 2010 CECC Reports concerning "forced abortions" and "coerced abortions and sterilizations." Like our sister circuit, who criticized an identical BIA conclusion about enforcement methods, we too question "[w]hy the BIA found the [CECC] Reports discussion of certain 'administrative punishments and coercive tactics to be persuasive, but [apparently] found the Reports' discussion of forced sterilizations and abortions in Fujian Province not to be persuasive. . . .'" [Ni v. Holder, 715 F.3d 620, 627 (7th Cir. 2013)].

Id. at 277-78 (footnotes omitted) (citations omitted). In Liem, we recently found this sort of cursory language to be insufficient, see, e.g., 921 F.3d at 396 ("The BIA cited to seven of the thirty-five exhibits submitted by Liem in support of his claim of materially changed country conditions. Based on those seven exhibits, but without even a cursory review or description of them, it determined that 'conditions [for Chinese Christians] have been a longstanding problem . . . in Indonesia, rather than materially changed

6

conditions or circumstances.'" (alterations in original)).  In any event, the BIA still failed to address the practice of coerced sterilizations and abortions.

Noting that the evidence indicates that alleged incidents of coercion to meet birth targets in some areas have been a longstanding concern, the BIA stated that the reports of renewed efforts to enforce family planning policies do not establish a significant change in conditions.  At best, it reasoned, the reports reflect the fact that pressures to enforce the policies vary from locale to locale and fluctuate incrementally from time to time.  Focusing specifically on Lianjiang County, the BIA concluded that the documents fail to establish a material change in conditions in Lin's locality:

> The respondent is from Lian Jiang County, Fujian Province.  The documents regarding the local enforcement in her home area reflect that residents there have been subject to the longstanding family planning policies, and that initiatives to promote compliance have been undertaken from time to time which included the distribution of family planning propaganda, scheduled check-ups, increased surveys, assessments of townships according to rates of social child support fee collections, IUD insertions, sterilizations, and other birth control measures, as well as campaigns to focus on the use of home visits, propaganda, and long-term birth control measures.  See, e.g., Exhs. H-I; Exh P; Exh. U at 2.2.2 and 3.6 [(AR188-AR206, AR293-AR306, AR353-AR354, AR537-AR358.)]  They do not establish a material change in conditions in the respondent's locality, but rather a continuation of the policy in place there since the time of the respondent's proceeding in 2008.  See Liu v. Att'y Gen., 555 F.3d 145, 148-49 (3d Cir. 2009); [S-Y-G-, 24 I. & N. Dec. at 247].

(AR5.)  Noting that a number of the documents "are from 2009 and 2010, and are outdated" (AR5 n.1), the BIA stated that "the evidence reflects that in 2016 the Chinese government raised the birth limit to two children per family."  (AR5 (citing Exhibits B at 1, DD at 1-2, KK (AR108-AR109, AR493-AR494, AR532-AR535)).)  It reasoned "[t]his easing of the government's family planning policy signals improving rather than

7

worsening conditions for those who may have violated the family planning rules."

(AR5.)  The BIA also determined that Lin's evidence "does not support her claim that the

Fujian Province has a policy of mandatory sterilization for parents returning with three

foreign-born children."  (Id. (citing AR58).)  According to the BIA, "[t]he documents she

offers do not indicate that sterilization would be forcibly imposed or that harm amounting

to persecution would be otherwise inflicted on the mother of U.S. born children who

returns to China."  (Id.)

      However, we conclude that the agency did not adequately address the extensive

evidence of both population control campaigns as well as local family planning policies

and practices.

      As we explained in Zhu, "[t]he Court of Appeals for the Seventh Circuit reviewed

many of the same documents and noted that if the documents are genuine, 'they

constitute strong evidence that harrowing practices are common in' her hometown and

county."  Zhu, 744 F.3d at 274-75 (quoting Ni, 715 F.3d at 628).  For example, Exhibit P

consisted of an "Announcement on Launching Countrywide Massive Family Planning

Clean-Up Work" by the "Lian Jiang County Population Family Planning Leadership

Group."  (AR294 (emphasis omitted).)  According to this official document, "it is

decided to launch the countywide 2011 New Year and Spring Festival massive cleanup

campaign on 'double check-ups, 'four surgeries' and social child support fee collections.

This is to stop the extra births beyond the quota, to build a solid foundation for family

planning work, and to ensure that goals set for 2011 population and family planning work

will be reached."  (Id.)  "Officials are instructed to enter homes and 'take every measure

8

possible to raise the materialization rate for 'four surgeries.'" Ni, 715 F.3d at 628. "Officials who do not meet goals will face 'great severities' and will be assessed as not qualified for the jobs for that year and will also be disciplined in other ways.'" Id.; see also Zhu, 744 F.3d at 275 n.9 (summarizing same Lianjiang County Population Family Planning Leadership Group document). The 2012 IRB report stated that (according to the IRB's legal consultant) "both internal government documents and significant anecdotal evidence indicate that the enforcement of family planning law is 'generally coercive' in the rural areas of Fujian, due in part to the pressure on officials to meet population targets or birth quotas (7 Sept. 2012)." (Exhibit U (AR357).) The Langqi Town Family Planning Office, Langqi Economic District, Fuzhou City, issued a "Notification on Further Reinforcement of Family Planning Campaign Work." (Exhibit I (AR199).) Exhibit I expressed the intent "to turn around the passive aspect of our town's family planning work"—thereby indicating that the document represented alterations in the town's enforcement efforts (id.). See, e.g., Liem, 921 F.3d at 397-98 (explaining that BIA ignored statements in exhibits indicating worsening conditions for Christians in Indonesia and failed to explain why such statements were unpersuasive while accepting other statements in same exhibits as persuasive). Although dating from 2009, there was no indication that the changes were confined to a temporary initiative or would otherwise expire. The whole point of Exhibit I was to subject returning parents with children born outside of the country to national and provincial family planning laws and regulations as well as the town's own requirements. Such parents could then be subject to mandatory sterilization, e.g.:

9

3. For overseas Chinese "backflow" from abroad who have ever given birth inside or outside of the country, regardless whether or not their children have obtained foreign nationalities, all parents without exception are subject to our town's family planning goals, and will be managed by current family planning management measures. Couples who give birth outside the plan shall pay the fine according to the current standard. Women of child-bearing age who meet the criteria for IUD insertion, must resolutely insert an IUD. Women who are pregnant outside the plan, shall undergo [dilation and curettage] abortion or induced-labor abortion, and if the nature of violation is bad, "one party of the couple" shall resolutely undergo sterilization.

(AR199 (Chinese characters omitted); see also, e.g., Exhibit FF (AR519) (November 11, 2011 ShanghaiDaily.com article claiming that "[a] woman was caught, brought to her hometown in southeast Fujian Province and forced to have a sterilization surgery a week ago" because "unauthorized births would affect [officials'] job performance").)

Admittedly, Exhibits I, P, and U are several years old and predate the 2016 increase in the birth limit to two children per family. However, the BIA never explained why this putative "easing of the government's family planning policy" had any bearing on someone with three children, even though it acknowledged elsewhere in its decision Lin's argument "that the recent amendment to the family planning policy allowing two children per couple does not have an effect on her case" (AR4 (citing AR57-AR58)). It also failed to consider evidence indicating that the purportedly coercive campaigns, policies, and practices addressed above have continued despite the policy change. For instance, the 2017 CECC report acknowledged that the two-child policy became effective on January 1, 2016 and that a number of provincial-level jurisdictions had revised their regulations in accordance with the amendment. "Human rights advocates, demographic experts, and others, however, expressed concerns that the coercive implementation of

10

family planning measures and human rights abuses will persist despite the adoption of the universal two-child policy." (Exhibit B (AR109) (footnotes omitted).) "Officials continue to enforce compliance with population planning targets using methods including heavy fines, job termination, arbitrary detention, and coerced abortion." (AR108 (footnote omitted).) As part of its "Coercive Implementation" discussion (under the heading "Official Campaigns"), the CECC report went on to observe that, during the reporting period, official reports from several provinces (including Fujian) "continued to promote 'family planning work' that entailed harsh and invasive family planning measures." (AR111.) "Some local government authorities stated in their reports that the goal of 'family planning work' is to maintain a low birth rate, and touted their successes in meeting this goal by compelling women to undergo the invasive 'three inspections' (intrauterine device (IUD), pregnancy, and health inspections), and 'four procedures' (IUD insertion, first-trimester abortion, mid- to late-term abortion, and sterilization), and the forcible collection of 'social compensation fees.'" (Id. (Chinese language omitted) (footnotes omitted).) Similarly, the IRB acknowledged that a source "could state" that Fujian Province "had revised their regulations" as of April 2016. (Exhibit KK (AR533 (citation omitted).) But the Canadian agency also stated that corroborating information and further details on the process and status of these amendments and their implementation could not be found. It indicated that (according to the 2015 State Department country report) provincial authorities still retained considerable discretion to determine enforcement measures (and that "[t]he March 2016 article in The Diplomat states that the 'creation and implementation of actionable guidelines has been left to the

11

provinces' and they have hesitated on 'how to implement the two-child policy'").
(AR534 (citation omitted).)  In an October 29, 2015 statement, Amnesty International asserted that "Chinese women will remain at risk of intrusive forms of contraception and coerced or forced abortions, despite the authorities announcing a change to the country's decades-long one-child policy."  (Exhibit HH (AR525); see also, e.g., Exhibit JJ (AR530) ("Reggie Littlejohn, President of Women's Rights Without Frontiers, told Breitbart News that 'forced abortion and involuntary sterilization continue under China's new Two-Child Policy.'").)

III.

For the foregoing reasons, we will grant the petition for review, vacate the BIA's order, and remand for further proceedings.  "In doing so, we do not decide whether [Lin] has shown materially changed conditions in [China] warranting reopening of [her] removal proceedings," Liem, 921 F.3d at 401, or that the evidence has "established her prima facie eligibility for the relief she seeks upon reopening" (AR4 (citations omitted)). Rather, we will remand for the agency to "meaningfully consider *all* of the evidence, which may or may not yield a different result." Liem, 921 F.3d at 401; see also, e.g., Zhu, 744 F.3d at 279 ("Rather, we will remand for the BIA to meaningfully review the evidence, which may yield a different result or a further explanation for the BIA's decision." (footnote omitted)); Ni, 715 F.3d at 631 ("In closing, we note that we make no prediction on the ultimate outcome of Ni's motion to reopen or his application for asylum.  But he is entitled to have the expert agency, the BIA, evaluate in a transparent way the evidence that he has presented.").

12

PORTER, *Circuit Judge*, dissenting.

The majority holds that the Board of Immigration Appeals failed to meaningfully consider evidence favorable to Guang Lin when it denied her motion to reopen her removal proceeding. On that basis, it grants Lin's petition for review and remands this matter to the Board for further consideration. I view the Board's analysis differently. The Board reviewed the relevant record evidence favoring Lin—expressly citing most of her exhibits and discussing their contents—but concluded that conditions in China had not changed since 2008, so it could not reopen her proceeding. Under our precedents, nothing more is required. And under our deferential standard of review, the Board's conclusion should not be disturbed. Because I would hold that the Board meaningfully considered Lin's evidence—and fear that our decision to the contrary weakens the standard and invites gamesmanship—I respectfully dissent.

The applicable standard is a "highly deferential" abuse-of-discretion review. *Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004). The Supreme Court has noted that an alien seeking reopening "bears a heavy burden," analogizing such a motion to "a motion for a new trial in a criminal case on the basis of newly discovered evidence." *I.N.S. v. Abudu*, 485 U.S. 94, 107 (1988). This is a high hurdle. Unsurprisingly, then, "motions to reopen are granted only under compelling circumstances." *Guo*, 386 F.3d at 561.

The majority identifies several of Lin's exhibits that the Board supposedly ignored. But the Board cited most of these documents and grappled with their implications for Lin's motion to reopen.

1

- **Exhibit P**. This 2010 Chinese government document from Lianjiang County—Lin's home county within Fujian Province—announces that the county government will increase enforcement of the family-planning policy. The Board expressly cited this document as reflecting "longstanding family planning policies" that the government has intermittently attempted to enforce. J.A. 7.

- **Exhibit U**. The Board discussed this document, which comes from Canada's Immigration and Refugee Board, in tandem with the previous exhibit. The Board specifically cited this document's subsections addressing Fujian Province. Admittedly, it did not specifically cite another subsection on forced abortions and sterilizations. But that subsection discuses those coercive measures in broad national strokes, whereas the subsections that the Board specifically cited discuss coercive measures within Fujian Province. *Compare* A.R. 355 § 3.3, *with* A.R. 357 § 3.6. In fact, this cited subsection actually discusses the Lianjiang County document (i.e., Exhibit P) in summarizing coercive population-control measures. A.R. 358.

- **Exhibit I**. This is a Chinese government document from a family-planning office within Fujian Province that discusses sterilization for returning nationals. A.R. 198. The Board cited and discussed this document multiple times in its decision. *See* J.A. 6, 7. The Board noted that documents like Exhibit I "announce renewed efforts to enforce the family planning policies that have been in place since the 1980s," but found that those documents do not rise to the level of changed country conditions. J.A. 6.

The majority also identifies a few exhibits—media reports and a statement from an international aid organization—that the Board did not expressly discuss.[1] But these omissions do not compromise the analysis, as the Board is not required to "expressly parse or refute on the record each individual argument or piece of evidence offered by the petitioner." *Zheng v. Att'y Gen.*, 549 F.3d 260, 268 (3d Cir. 2008) (quoting *Wang v. BIA*,

---

[1] These include Exhibit FF, a November 2011 article from "ShanghaiDaily.com" that reported on a forced sterilization in Fujian Province; Exhibit HH, an October 2015 Amnesty International statement that predicted, "Chinese women will remain at risk of intrusive forms of contraception and coerced or forced abortions, despite the authorities announcing a change to the country's decades-long one-child policy"; and Exhibit JJ, a Breitbart News article suggesting that forced abortions and involuntary sterilization will continue under the two-child policy.

2

437 F.3d 270, 275 (2d Cir. 2006)). It also need not "write an exegesis on every contention." *Filja v. Gonzales*, 447 F.3d 241, 256 (3d Cir. 2006) (quoting *Mansour v. I.N.S.*, 230 F.3d 902, 908 (7th Cir. 2000)). Rather, the Board must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id*. (quoting *Mansour*, 230 F.3d at 908). This means that the Board "must at least show that it has reviewed the record and grasped the movant's claims." *Id*. By considering Lin's most authoritative documentary evidence and conducting a case-specific analysis of it, the Board decision here met this threshold.[2] That is enough.[3]

Indeed, the Board's analysis here is a far cry from the more "perfunctory" treatments sometimes seen in other administrative proceedings. *Zhu v. Att'y Gen*., 744 F.3d 268, 278 (3d Cir. 2014). In *Zhu*, which undergirds the majority's opinion, the Board made a number of missteps. For one thing, it "did not specifically discuss" many

---

[2] *See Yu v. Att'y Gen*., 513 F.3d 346, 349 (3d Cir. 2008) ("This Court has repeatedly recognized that State Department reports may constitute substantial evidence[.]" (citation omitted)); *see also Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003) ("Our case law well establishes 'that the country report from our Department of State is the 'most appropriate' and 'perhaps best resource,' for determining country conditions." (quoting *Lal v. I.N.S.*, 255 F.3d 998, 1023 (9th Cir. 2001))).

[3] The majority also makes the more global assertion that the Board excluded "any reference to the incidents of coerced or forced sterilization and abortion (including in Fujian Province) described in the CECC, State Department, and IRB documents." Maj. Op. 6. But the Board cited these very sources in noting that "alleged incidents of coercion to meet birth targets in some areas of China have been a longstanding concern," and these incidents represent "a continuation of the policy in place" since Lin's 2008 proceeding. J.A. 6–7. The majority may interpret these documents differently than the Board, but that does not mean that the Board did not meaningfully consider them.

3

documents from the petitioner's hometown and county. *Id*. at 275. Here, by contrast, the Board considered documents from Lin's home county, but found that they did not amount to a change in government policy. The Board decision in *Zhu* also was inconsistent on whether the petitioner's evidence had to be locality-specific. 744 F.3d at 276. It discounted some evidence favoring the petitioner because it was not tethered closely enough to the petitioner's hometown, but then credited far more general evidence that was unfavorable to the petitioner. *Id*. Such analytical inconsistency is not apparent here.[4]

By likening the Board's decision here to the deficient review in *Zhu*, we risk creating perverse incentives for petitioners seeking to reopen proceedings. Savvy petitioners will realize that the more exhibits they throw at the Board, the greater the likelihood that the Board will fail to discuss some of them—and the greater the likelihood that this Court will find that the Board failed to meaningfully consider evidence. This is why we have never held that the Board "must discuss every piece of evidence mentioned by" a petitioner; we require simply that it "not ignore evidence favorable to the alien." *Huang v. Att'y Gen*., 620 F.3d 372, 388 (3d Cir. 2010).

_____

[4] *Liem* is of limited relevance here for similar reasons. *Liem v. Att'y Gen*., 921 F.3d 388 (3d Cir. 2019). The Board in *Liem* cited just seven of the thirty-five exhibits that the petitioner submitted and did not provide even a "cursory review or description of them." *Id*. at 396. Unlike this failure "to even mention the vast majority of the exhibits submitted by Liem," the Board here specifically discussed most of Lin's exhibits—about twenty-six out of thirty-seven exhibits, by my count—and may have considered others. *Id*. at 398.

The *Liem* panel also leaned heavily on a recent case from the First Circuit that suggested that conditions for Christians in Indonesia had materially changed for the worse. *Id*. at 400 (citing *Sihotang v. Sessions*, 900 F.3d 46 (1st Cir. 2018)). Here, there is no similarly persuasive recent guidance.

Of course, a holding that the Board meaningfully considered Lin's evidence is not an endorsement of China's official family-planning policy, which remains abhorrent.[5] But the question before us is not the rectitude of Chinese government policy; it is whether the Board meaningfully considered Lin's evidence that conditions in her native China have changed since her last proceeding. That is a different question with a different answer. Because the record here shows that the Board meaningfully considered Lin's evidence, I would deny her petition for review arguing otherwise.

---

[5] The harms of China's family-planning policy have been chronicled for decades. *See, e.g.*, Steven W. Mosher, *Broken Earth* (1983); Steven W. Mosher, *A Mother's Ordeal* (1993). But this means that—as the Board found—Lin's evidence shows continued circumstances rather than changed conditions.