**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2904
_____

ALEX MONDAY ASUQUO ITA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a Decision of the
Board of Immigration Appeals
(Agency No. A203-093-648)
Immigration Judge: David W. Crosland
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
(April 18, 2023)

Before: HARDIMAN, PORTER, and FISHER, *Circuit Judges*

(Filed: April 26, 2023)

_____

OPINION[*]
_____

HARDIMAN, *Circuit Judge*.

Alex Monday Asuquo Ita petitions for review of a Board of Immigration Appeals

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

decision rejecting his application for deferral of removal under the Convention Against Torture (CAT). We will deny his petition.

I

Ita is a native and citizen of Nigeria. He became a lawful permanent resident of the United States in 2010. But after a series of arrests and drug convictions, the Department of Homeland Security began removal proceedings against him. Ita applied for CAT deferral, arguing that the Nigerian government would torture him due to his drug addiction and mental health problems.

At a hearing before the Immigration Judge, Ita testified that he suffered serious sexual abuse as a child. He said he received no psychological assistance for the resulting trauma, so he turned to drugs in 2006 to "keep [his] emotion[s] together." AR 117. Ita did drugs "every day." *Id.* Though medicated for depression, he never sought or received treatment for his drug abuse apart from a few court-ordered classes. He has been regularly employed, but "cannot do anything without having drugs." AR 118–19. Ita said that he "[a]bsolutely" would keep using drugs if removed. AR 133. And he believes no treatment for his addiction is available in Nigeria.

Shannon Lockhart, a licensed clinical social worker, also testified on behalf of Ita. She diagnosed Ita with severe substance use disorder, PTSD, major depression, and general anxiety disorder. And she said Ita would need proper medical and psychological care—including inpatient treatment—to withdraw from drugs. But she opined that Nigeria's capacity to treat patients with a drug abuse history like Ita's was "far below the minimal standard of care." AR 206. Lockhart concluded that Ita stood in "grave jeopardy

2

of being declared a civil lunatic" under Nigeria's involuntary commitment laws, AR 484 (emphasis omitted), of becoming a target of Nigeria's police, and of being tortured.

Dr. Gboyega Abikoye, a Nigerian clinical psychologist who specializes in drug and behavior addiction, also testified for Ita. He testified that Nigeria offers few forms of drug-abuse treatment, and that affordable treatment centers are inadequate. Abikoye concluded that Ita's condition is "going to get worse" in Nigeria, AR 383, and his drug use would eventually get him arrested. Abikoye testified that Nigerian police often arrest drug violators and negotiate with the arrestee's family for bribes in exchange for release. The police torture or even kill arrestees who say they cannot pay.

The IJ denied Ita's application for deferral of removal and ordered him removed. The IJ said he had considered all the evidence in the administrative record, found all witnesses credible, and would afford Lockhart's and Abikoye's testimony appropriate weight. He concluded that Ita would likely continue to use drugs in Nigeria; be arrested by Nigerian authorities; and, if arrested, face "legal process and punishment," including potential imprisonment. AR 53. But he found that Ita had not established a likelihood of torture. The IJ observed that: Ita has no personal contacts in Nigeria; Abikoye was not an expert in Nigerian prison systems or police practices; record evidence supporting Ita's likelihood of torture was dated or statistically limited; and a United Nations report on drug use in Nigeria mentions no extrajudicial harm or torture. He also concluded that Ita was not likely to be involuntarily committed per Nigeria's lunacy laws. Family members usually initiate the commitment process, and Ita has no family in Nigeria. And Ita submitted recommendation letters from friends and employers in the United States that

show he can comport himself in a way unlikely to draw the attention of the civil-commitment authorities.

Ita appealed the IJ's order to the Board of Immigration Appeals. He claimed legal error in the IJ's analysis of the likelihood that he would be tortured in Nigeria and clear error in the IJ's finding that he was unlikely to be involuntarily committed under the civil lunacy laws. The Board adopted and affirmed the IJ's decision and dismissed Ita's appeal. The Board agreed that Ita would likely be arrested for his continued drug use in Nigeria but that he had not shown a likelihood of torture.

Ita timely petitions for review of the Board's decision. Because the Board adopted and affirmed the IJ's decision, we review the IJ's decision too. *Herrera-Reyes v. Att'y Gen.*, 952 F.3d 101, 106 (3d Cir. 2020).

## II[1]

To warrant CAT deferral, Ita had to show by preponderance that he will be tortured if removed. 8 C.F.R. § 208.16(c)(2). The IJ conducted a two-part inquiry, beginning with the factual question of what was likely to happen to Ita if he were removed to Nigeria, followed by the legal question of whether his anticipated treatment would constitute torture. *Myrie v. Att'y Gen.*, 855 F.3d 509, 516 (3d Cir. 2017). The Board was required to review the first determination for clear error, the second de novo. *Id.*

---

[1] We have jurisdiction under 8 U.S.C. § 1252(a)(1). The Board had jurisdiction under 8 C.F.R. § 1003.1(b)(3) and 8 C.F.R. § 1240.15.

## A

Ita first argues that the Board applied the wrong legal standard. In support of that argument, he relies entirely on this statement of the Board: "[T]he Immigration Judge found, without clear error, that the respondent did not show by clear probability that he will be tortured." AR 3. Ita claims the Board "blended" the factual and legal inquiries, precluding meaningful review of the decision. Ita Br. 11. When the Board's decision is considered in its entirety, Ita's argument is unpersuasive.

The Board applied the proper standards of review—clear error for facts, de novo for "all other issues." AR 3. And following its challenged statement, the Board cited the IJ's entire CAT analysis, which plainly distinguishes factual and legal determinations. So the Board's statement that the IJ "found, without clear error, that [Ita] did not show . . . he will be tortured by anyone in Nigeria" expressed the Board's view that the IJ did not clearly err in finding that Ita failed to establish the likelihood of any occurrence amounting to torture.

The structure of the Board's decision also rebuts Ita's argument. The Board acknowledged the IJ's factual findings that Ita would likely continue using drugs and be arrested in Nigeria, and echoed the IJ that Ita had not shown a likelihood that he would be abused by the police or involuntarily institutionalized. The Board then cited authorities defining torture as a legal standard and "agree[d] with the Immigration Judge"—without showing any deference to him—that what was likely to befall Ita did not amount to torture. In sum, the Board "considered the appropriate [legal] standard." *Myrie*, 855 F.3d at 517.

B

Ita next argues that the Board erred in finding what was likely to befall him in Nigeria because it failed to consider evidence, and "cherry-picked" evidence from other sources. Ita Br. 15. Specifically, Ita claims that the IJ and BIA "ignored entirely" a 2020 human rights report compiled by the U.S. Department of State because neither the IJ nor the Board "address[ed]" it. Ita Br. 13.

It is "usually sufficient" for the IJ to say, as he did here, that he considered evidence his decision doesn't "specifically address[]." *Quinteros v. Att'y Gen.*, 945 F.3d 772, 786 (3d Cir. 2019) (cleaned up). Ita's inference—failure to mention a piece of evidence "demonstrates" that it was ignored, Ita Br. 16—is faulty. *See Sevoian v. Ashcroft*, 290 F.3d 166, 178 (3d Cir. 2002) (crediting Board's statement that it "surveyed the record" even where Board did not address record evidence that painted a "darker picture" than the evidence the Board discussed). And the IJ specifically stated that he had considered the human rights report. *See* AR 37, 850.

Ita also faults the IJ for not addressing evidence that he would likely be involuntarily committed to a mental health institution in Nigeria. That wrongly assumes the IJ must have ignored evidence the IJ did not quote. And again, substantial evidence supports the Board's affirmation of the IJ's finding. *See Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020) (we review the Board's CAT factfinding for substantial error). The IJ recognized that those committed involuntarily to Nigeria's mental health institutions "usually" are committed "by relatives." AR 54. But Ita has no relatives in Nigeria, and the IJ noted recommendation letters evidencing Ita's ability to maintain a regular external

6

appearance despite his substance abuse problems.

Finally, Ita argues that the Board "ignored" Lockhart's and Abikoye's testimony. Not so. The IJ credited their testimony and stated that he would afford it appropriate weight based on the witness's knowledge and expertise. *See Matter of J-G-T-*, 28 I. & N. Dec. 97, 103 (BIA 2020). The Board was entitled to give limited weight to Lockhart's statement that Ita would be in "grave danger" of involuntary commitment. AR 53 (quoting AR 484). Lockhart's qualifications and experience were unrelated to Nigeria's enforcement of its lunacy laws.

Likewise for the Board's decision to appropriately weigh Abikoye's testimony about Nigerian prison conditions or police practices. Abikoye was not an expert in those subjects, and his report cites no sources supporting Ita's likely criminological fate in Nigeria. The Board "explained why it rejected" significant reliance on Abikoye's testimony, and the record supports that decision. *See Fei Yan Zhu v. Att'y Gen.*, 744 F.3d 268, 276–77 (3d Cir. 2014).

Ita next argues that the Board "cherry-picked" portions of certain evidence while "ignoring" other portions of the same sources. This argument rests in part on the same faulty inference discussed above. To the extent it doesn't, we reject it.

Ita blames the IJ for misreading a law review article in the record. The IJ quoted the article as saying, "police brutality remains a regular occurrence in the operations of the [Nigerian Police Force]." AR 52 (quoting AR 682–83). The IJ then said the statistics supporting that conclusion were "dated and taken from limited samples"—for example, a 1991 study. *Id.* The IJ did misread the article when he said it rested on the 1991 study: the

7

quoted portion of the article was discussing a 2014 Amnesty International report. But even the Amnesty International report was published nine years ago—before various Nigerian criminal justice reforms that the record elsewhere details. So we cannot say the Board "cherry-picked" information detrimental to Ita's application from this law review article.

## C

Last, Ita argues that the Board erred in determining that what was likely to befall him in Nigeria is not torture. But this challenge merely repackages Ita's disagreement with the Board's factual findings. Ita disputes its reading of the "evidence in the record" about the Nigerian police, Ita Br. 21, and asserts that its allegedly mistaken prediction of "what is likely to happen" to him precluded a proper legal determination, *id.* at 22. Those claims contest facts found by the Board, not the application of legal standards to facts. We therefore reject Ita's final argument.

\*　　\*　　\*

For the reasons given, we will deny the petition for review.